IN the INTEREST OF JERRELL C.J.,
a person Under the Age of 17:

STATE of Wisconsin,
Petitioner-Respondent,

v.

JERRELL C.J.,
Respondent-Appellant-Petitioner.

Supreme Court

*No. 2002AP3423. Oral argument November 9, 2004.
—Decided July 7, 2005.*

2005 WI 105

(Also reported in 699 N.W.2d 110.)

For the respondent-appellant-petitioner there were briefs and oral argument by *Eileen A. Hirsch,* assistant state public defender.

For the petitioner-respondent the cause was argued by *Gregory M. Weber,* assistant attorney general, with whom on the brief was *Peggy A. Lautenschlager,* attorney general.

An amicus curiae brief was filed by *Steven A. Drizin,* Chicago, IL, on behalf of the Children and Family Justice Center Northwestern University School of Law; *Marygold S. Melli,* Professor Emerita, Madison, on behalf of the University of Wisconsin Law School; and *Marsha L. Levick,* Philadelphia, PA, on behalf of the Juvenile Law Center.

An amicus curiae brief was filed by *Keith A. Findley* and *John A. Pray,* Madison, on behalf of the Wisconsin Innocence Project of the Frank J. Remington Center-University of Wisconsin Law School; *Barry C. Scheck, Peter Neufeld, Madeline deLone,* New York, NY, on behalf of the Innocence Project of the Benjamin N. Cardozo School of Law-Yeshiva University; *Julie Jonas,* St. Paul, MN, on behalf of the Innocence Project of Minnesota-Hamline University School of Law; *Bill Allison,* Austin, TX, on behalf of the Innocence Clinic and Criminal Defense Clinic-University of Texas School of Law; *Jacqueline McMurtrie,* Seattle, WA, on behalf of the Innocence Project NW Clinic-University of Washington School of Law; *Theresa A. Newman,* Durham, NC, on behalf of the Center on Actual Innocence; *Emily Maw,* New Orleans, LA, on behalf of the Innocence

149

Project New Orleans; *Binny Miller,* Washington, D.C., on behalf of the Criminal Justice Clinic-American University, Washington College of Law; *Richard Leo,* Irvine, CA, on behalf of the Department of Criminology, Law and Society-University of California-Irvine; *Dr. Robert Schehr,* Flagstaff, AZ, on behalf of the Northern Arizona Justice Project and Department of Criminal Justice-Northern Arizona State University; *Andre Moenssens,* Columbia City, IN, on behalf of the University of Missouri-Kansas City; the Center on Wrongful Convictions-Northwestern University School of Law, Chicago, IL; the Innocence Project of the National Capital Region-American University-Washington College of Law, Washington, D.C.; National Association of Criminal Defense Lawyers, Washington, D.C.; and the Wisconsin Association of Criminal Defense Lawyers, Monona.

¶ 1. ANN WALSH BRADLEY, J.   The petitioner, Jerrell C.J., seeks review of a published decision of the court of appeals affirming a delinquency adjudication and the denial of a postdisposition motion.[1] Jerrell was adjudged delinquent for the commission of armed robbery, party to a crime.

¶ 2.   This case presents three distinct but related issues. First, Jerrell contends that his written confession to the police was involuntary. Second, he asks this court to adopt a per se rule, excluding in-custody admissions from any child under the age of 16 who has not been given the opportunity to consult with a parent

---

[1] *State v. Jerrell C.J.,* 2004 WI App 9, 269 Wis. 2d 442, 674 N.W.2d 607 (Ct. App. 2003) (affirming a delinquency adjudication and the denial of a postdisposition motion of the circuit court for Milwaukee County, Francis T. Wasielewski, Judge).

or interested adult. Third, he asks this court to adopt a rule requiring police to electronically record all juvenile interrogations.[2]

¶ 3.  We agree with Jerrell that his written confession to the police was involuntary under the totality of the circumstances. However, we decline to adopt his proposed per se rule regarding consultation with a parent or interested adult. Finally, we exercise our supervisory power to require that all custodial interrogations of juveniles in future cases be electronically recorded where feasible, and without exception when questioning occurs at a place of detention.[3] Accordingly, we reverse the decision of the court of appeals.

I

¶ 4.  Shortly after midnight on Saturday, May 26, 2001, three young men robbed a McDonald's restaurant in Milwaukee. Each was wearing a ski mask and holding a gun. Two of the men went to the kitchen and

---

[2] Additionally, Jerrell asserts that (1) his written confession was not sufficiently corroborated to support his delinquency adjudication, and (2) he did not knowingly, voluntarily, and intelligently waive his *Miranda* rights. Because we conclude that his confession was involuntary, we do not address these issues.

[3] We use the term "juvenile" in a manner consistent with the Juvenile Justice Code:

> "Juvenile" means a person who is less than 18 years of age, except that for purposes of investigating or prosecuting a person who is alleged to have violated a state or federal criminal law or any civil law or municipal ordinance, "juvenile" does not include a person who has attained 17 years of age.

Wis. Stat. § 938.02(10m). All references to the Wisconsin Statutes are to the 2001–02 version unless otherwise noted.

ordered employees to lie down on the floor. The third went to the office, where the manager put $3590 in the robber's bag. All three men then left.

¶ 5.   One person, an employee suspected of unlocking the door for the men, was detained by police later that morning. Three others were detained and arrested as suspects on Sunday evening. On Monday morning, at approximately 6:20 a.m., 14–year-old Jerrell was arrested at his home. He was taken to the police station, booked, and placed in an interrogation room.

¶ 6.   In the interrogation room, Jerrell was handcuffed to a wall and left alone for approximately two hours. At 9:00 a.m., Police Detectives Ralph Spano and Kurt Sutter entered the interrogation room. The detectives introduced themselves, removed Jerrell's handcuffs, and asked him some background questions. Jerrell stated that he was 14 years old and in eighth grade. He also provided the names, addresses, and phone numbers of his parents and siblings.

¶ 7.   At 9:10 a.m., Detective Spano advised Jerrell of his *Miranda* rights.[4] The detectives then began to question Jerrell about the armed robbery at McDonald's. Jerrell denied his involvement. The detectives challenged this denial and encouraged Jerrell to be "truthful and honest" and "start standing up for what he did." Jerrell again denied his involvement. The detectives again challenged this denial.

---

[4] Under *Miranda v. Arizona,* 384 U.S. 436 (1966), persons facing custodial interrogation must be warned that they have the right to remain silent, that anything they say may be used against them in court, that they have the right to an attorney, and that an attorney will be appointed for them if they cannot afford one.

¶ 8.  At times in this exchange, Detective Spano raised his voice. He later explained, "I'm raising my voice short of yelling at him . . . there were points I needed to make, and I needed to make them with a strong voice. But not yelling." Jerrell described the "raised voice," stating, "I'm not quite sure but it's like he was angry with me. That sort of tone in his voice." Jerrell indicated that it made him feel "kind of frightened."

¶ 9.  During the questioning, Jerrell was afforded food and bathroom breaks. He was kept in the interrogation room until lunchtime. At lunch, he was placed in a bullpen cell for about 20 minutes where he ate. The questioning resumed about 12:30 p.m. In the interrogation room, Detective Spano said Jerrell "started opening up about his involvement and everybody else's" somewhere between 1:00 and 1:30 p.m.

¶ 10.  It is undisputed that "several times" during the interrogation, Jerrell asked "if he could make a phone call to his mother or father."[5] Each time Detective Spano said "no." Detective Spano later testified that he "never" in 12 years allowed a juvenile to contact parents during interrogation because it could stop the flow or jeopardize it altogether. He explained:

> If I don't have any control about what he can say over the phone or what he can do when he has got the phone in his hand, I don't think it is prudent or proper to let him do that.

---

[5] It is unclear from the record whether Jerrell asked for his parents before or after he started opening up about his involvement in the crime. However, the issue of timing is irrelevant, as Jerrell is not seeking to suppress any oral statements he made to police. Rather, he is seeking to suppress his written confession that came at 2:40 p.m., well after his attempts to talk to his parents.

¶ 11. At 2:40 p.m., over five-and-a-half hours after interrogation began, and eight hours after he was taken into custody, Jerrell signed a statement prepared by Detective Spano. In it, he admitted his involvement in the McDonald's robbery.

¶ 12. Jerrell subsequently moved to suppress his written confession, claiming that it was involuntary, unreliable, and a product of coercion. The circuit court denied the motion. Jerrell was then tried with a co-defendant and adjudged delinquent for committing armed robbery, party to a crime.

¶ 13. After his adjudication, Jerrell filed a postdisposition motion seeking a new trial on the basis that his confession was unreliable, untrustworthy, and involuntary. The motion focused on inconsistencies between Jerrell's statement and that of eyewitnesses and other participants. Again, the circuit court denied the motion. It found the discrepancies between Jerrell's statement and the other evidence were not material. Additionally, it concluded that the statement, under the totality of the circumstances, was voluntary.

¶ 14. On appeal, Jerrell maintained that his confession was involuntary. He asserted that the police officers should have granted one of his several requests to call his parents, which were all made prior to the signing of the written statement. The court of appeals affirmed the circuit court, concluding that it did not err in denying Jerrell's motion to suppress the written statement. In doing so, however, the court of appeals cautioned that "a juvenile's request for parental contact should not be ignored." *State v. Jerrell C.J.,* 2004 WI App 9, ¶ 1, 269 Wis. 2d 442, 674 N.W.2d 607 (Ct. App. 2003).

¶ 15. Finally, the court of appeals wrote separately to express its grave concern with the issue of

154

false confessions made by juveniles during custodial interrogation. *Id.*, ¶¶ 24–32. Its opinion concludes with a call for action:

> It is this court's opinion that it is time for Wisconsin to tackle the false confession issue. We need to take appropriate action so that the youth of our state are protected from confessing to crimes they did not commit. We need to find safeguards that will balance necessary police interrogation techniques to ferret out the guilty against the need to offer adequate constitutional protections to the innocent.

*Id.*, ¶ 32.

## II

¶ 16. In reviewing the voluntariness of a statement, we examine the application of constitutional principles to historical facts. *State v. Hoppe,* 2003 WI 43, ¶ 34, 261 Wis. 2d 294, 661 N.W.2d 407. We defer to the circuit court's findings regarding the factual circumstances surrounding the statement. *Id.* (citing *Arizona v. Fulminante,* 499 U.S. 279, 287 (1991); *State v. Clappes,* 136 Wis. 2d 222, 235, 401 N.W.2d 759 (1987)). However, the application of constitutional principles to those facts presents a question of law subject to independent appellate review. *Id.*

## III

¶ 17. The first issue presented for our review is whether Jerrell's written confession to police was constitutionally voluntary. If his confession was involun-

tary, its admission would violate Jerrell's due process rights under the Fourteenth Amendment of the U.S. Constitution and Article I, Section 8 of the Wisconsin Constitution. *Id.,* ¶ 36 (citing *Rogers v. Richmond,* 365 U.S. 534, 540 (1961); *State v. McManus,* 152 Wis. 2d 113, 130, 447 N.W.2d 654 (1989)). It is the State's burden to prove the voluntariness of a confession by a preponderance of the evidence. *Id.,* ¶ 40 (citing *United States v. Haddon,* 927 F.2d 942, 945 (7th Cir. 1991); *State v. Agnello,* 226 Wis. 2d 164, 182, 593 N.W.2d 427 (1999)).

¶ 18.    The principles of law governing the voluntariness inquiry are summarized in *Hoppe,* 261 Wis. 2d 294. There, the court observed that a defendant's statements are voluntary "if they are the product of a free and unconstrained will, reflecting deliberateness of choice, as opposed to the result of a conspicuously unequal confrontation in which the pressures brought to bear on the defendant by representatives of the State exceeded the defendant's ability to resist." *Id.,* ¶ 36 (citing *Clappes,* 136 Wis. 2d at 236; *Norwood v. State,* 74 Wis. 2d 343, 364, 246 N.W.2d 801 (1976); *State v. Hoyt,* 21 Wis. 2d 284, 308, 128 N.W.2d 645 (1964)).

■

¶ 19.    A necessary prerequisite for a finding of involuntariness is coercive or improper police conduct. *Id.,* ¶ 37 (citing *Colorado v. Connelly,* 479 U.S. 157, 167 (1986); *Clappes,* 136 Wis. 2d at 239). However, police conduct need not be egregious or outrageous in order to be coercive. *Id.,* ¶ 46. "Rather, subtle pressures are considered to be coercive if they exceed the defendant's ability to resist. Accordingly, pressures that are not coercive in one set of circumstances may be coercive in

another set of circumstances if the defendant's condition renders him or her uncommonly susceptible to police pressures." *Id.*

¶ 20.    The voluntariness of a confession is evaluated on the basis of the totality of the circumstances surrounding that confession. *Id.*, ¶ 38 (citing *Clappes,* 136 Wis. 2d at 236); *Theriault v. State,* 66 Wis. 2d 33, 41, 223 N.W.2d 850 (1974). This analysis involves a balancing of the personal characteristics of the defendant against the pressures and tactics used by law enforcement officers. *Hoppe,* 261 Wis. 2d 294, ¶ 38 (citing *Clappes,* 136 Wis. 2d at 236). The *Hoppe* court explained:

> The relevant personal characteristics of the defendant include the defendant's age, education and intelligence, physical and emotional condition, and prior experience with law enforcement. The personal characteristics are balanced against the police pressures and tactics which were used to induce the statements, such as:   the length of the questioning, any delay in arraignment, the general conditions under which the statements took place, any excessive physical or psychological pressure brought to bear on the defendant, any inducements, threats, methods or strategies used by the police to compel a response, and whether the defendant was informed of the right to counsel and right against self-incrimination.

*Id.*, ¶ 39 (internal citations omitted).

¶ 21.    When applying this test to a juvenile interrogation, we note that "[t]he Supreme Court in the past has spoken of the need to exercise 'special caution' when assessing the voluntariness of a juvenile confession, particularly when there is prolonged or repeated questioning or when the interrogation occurs in the absence

of a parent, lawyer, or other friendly adult." *Hardaway v. Young,* 302 F.3d 757, 762 (7th Cir. 2002) (citing *In re Gault,* 387 U.S. 1, 45 (1967); *Gallegos v. Colorado,* 370 U.S. 49, 53–55 (1962); *Haley v. Ohio,* 332 U.S. 596, 599–601 (1948)).

¶ 22. With the above principles in mind, we turn to the present case. Here, Jerrell argues that the police exploited his age, lack of comprehension, and other personal characteristics to overbear his will. He contends that the police improperly denied his requests to telephone his parents during questioning. Additionally, he asserts that the length of his custody along with the interrogation techniques used by the police were unfairly coercive.

¶ 23. The State, meanwhile, maintains that the factors identified by Jerrell are not enough to render his confession constitutionally suspect. It submits that the circuit court found sufficient facts based upon competent evidence to conclude that Jerrell's confession was not coerced. Accordingly, the State asks this court to hold that Jerrell's custodial statement was constitutionally voluntary.

¶ 24. In assessing the totality of the circumstances, we first examine Jerrell's relevant personal characteristics. Here, these include his age, education and intelligence, and prior experience with law enforcement. We then consider the pressures and tactics used by the police such as the refusal of Jerrell's requests to talk to his parents, the length of the custody, and the psychological techniques applied to Jerrell.

¶ 25. Courts have long recognized the importance of age in determining whether a juvenile confession is voluntary. For example, in *Haley,* 332 U.S. at 599, the juvenile's "tender and difficult age" of 15 was a significant factor favoring the Supreme Court's suppression of

his confession. Likewise, in *Hardaway*, 302 F.3d at 764, the Seventh Circuit Court of Appeals recognized that "[t]he difficulty a vulnerable child of 14 would have in making a critical decision about waiving his *Miranda* rights and voluntarily confessing cannot be understated."

¶ 26. We agree with the case law's recognition that "youth is more than a chronological fact." *Eddings v. Oklahoma*, 455 U.S. 104, 115 (1982). While not necessarily dispositive, "youth remains a critical factor for our consideration, and the younger the child the more carefully we will scrutinize police questioning tactics to determine if excessive coercion or intimidation or simple immaturity that would not affect an adult has tainted the juvenile's confession." *Hardaway*, 302 F.3d at 765. Simply put, children are different than adults, and the condition of being a child renders one "uncommonly susceptible to police pressures." *Hoppe*, 261 Wis. 2d 294, ¶ 46.[6] We therefore view Jerrell's young age of 14 to be a strong factor weighing against the voluntariness of his confession.

---

[6] Scholarly research supports this. For example, one commentator has observed that juveniles may be more susceptible than adults to making false confessions for a number of reasons. See Jennifer J. Walters, Comment, *Illinois' Weakened Attempt to Prevent False Confessions by Juveniles: The Requirement of Counsel for the Interrogations of Some Juveniles*, 33 Loy. U. Chi. L.J. 487, 504–05 (2002). Because their intellectual capacity is not fully developed, children are less likely to understand their *Miranda* rights. *Id.* Additionally, minors are more likely to want to please and believe police officers because they are authority figures. *Id.* at 505. Finally, because juveniles are incapable of fully realizing the consequences of their decisions, they may confess because they believe it is the only way to end a psychologically coercive interrogation. *Id.*

¶ 27. Another factor weighing against the voluntariness of Jerrell's confession is his education and intelligence. At the time of the interrogation, Jerrell was in eighth grade and earning a 3.6 grade point average. Although such academic achievement is usually consistent with a high degree of aptitude, postdisposition standard IQ testing revealed that Jerrell had an IQ of 84, indicating a low average range of intelligence. The reliability of the IQ test is supported by Jerrell's previous school records, showing average to failing grades, as well as testing completed by the Ethan Allen School. Accordingly, we consider Jerrell's limited education and low average intelligence as additional reasons for why he was susceptible to police pressure.

¶ 28. Finally, we examine Jerrell's prior experience with law enforcement. In cases where courts have found that prior experience weighs in favor of a finding of voluntariness, the juvenile's contacts with police have been extensive. *See, e.g., Hardaway,* 302 F.3d at 767 (noting that the juvenile was arrested 19 times for crimes as serious as robbery and attempted sexual assault and had appeared in juvenile court with appointed counsel seven times); *Fare v. Michael C.,* 442 U.S. 707, 710 (1979) (citing the juvenile's record of

---

*See also* Steven A. Drizin & Richard A. Leo, *The Problem of False Confessions in the Post DNA World,* 82 N.C. L. Rev. 891, 944 (2004) (documenting 40 proven false juvenile confessions, including five from the infamous Central Park Jogger case); Welsh S. White, *False Confessions and the Constitution: Safeguards Against Untrustworthy Confessions,* 32 Harv. C.R.-C.L. Rev. 105, 131 (1997) ("Empirical data suggest that suspects who are especially vulnerable for other reasons such as youth, brain damage, or compliant personalities may be similarly prone to give false confessions.").

several previous offenses, his more than four years of probation, and his term in a youth corrections camp).

¶ 29.  In this case, Jerrell's experience with law enforcement was more limited and may have contributed to his willingness to confess in the case at hand. Jerrell had been arrested twice for misdemeanor offenses prior to his interrogation for the armed robbery. In both instances, he answered police questions, admitted to involvement, and was allowed to go home. Significantly, he was never adjudged delinquent. We note the argument of Jerrell's counsel that such an experience may have taught him a dangerous lesson that admitting involvement in an offense will result in a return home without any significant consequences.

¶ 30.  Having examined Jerrell's relevant personal characteristics, we now consider the pressures and tactics used by the police during the interrogation, beginning with the refusal of Jerrell's requests to talk to his parents. Thirty years ago this court rejected a per se rule requiring parental presence in juvenile interrogations. *Theriault*, 66 Wis. 2d at 44. In doing so, however, the court stressed the importance of parental presence in the totality of the circumstances analysis:

> The failure to promptly notify [parents] and the reasons therefor may be a factor, however, in determining whether the confession was coerced or voluntary. If the police fail to call the parents for the purpose of depriving the juvenile of the opportunity to receive advice and counsel, that would be strong evidence that coercive tactics were used to elicit the incriminating statements.

*Id.* at 48.

¶ 31.  Here, the police specifically denied Jerrell's requests to call his parents. Detective Spano later testified that he "never" in 12 years allowed a juvenile to

contact parents during interrogation because it could stop the flow of, or jeopardize the interrogation. We are troubled by this tactic, as parents are often the very people children turn to for advice. Such an approach appears to circumvent the warning set forth in *Theriault* that "[i]f the police fail to call the parents for the purpose of depriving the juvenile of the opportunity to receive advice and counsel, that would be strong evidence that coercive tactics were used to elicit the incriminating statements." *Id.* Consistent with *Theriault*, we view the denial of Jerrell's requests to talk to his parents as strong evidence of coercive police conduct.

¶ 32.  The length of the custody is also an important factor in evaluating police behavior. In *Miranda v. Arizona*, 384 U.S. 436, 476 (1966), the Supreme Court warned that lengthy interrogation or incommunicado incarceration could be strong evidence of coercion:

> Whatever the testimony of the authorities as to waiver of rights by an accused, the fact of lengthy interrogation or incommunicado incarceration before a statement is made is strong evidence that the accused did not validly waive his rights. In these circumstances the fact that the individual eventually made a statement is consistent with the conclusion that the compelling influence of the interrogation finally forced him to do so. It is inconsistent with any notion of a voluntary relinquishment of the privilege.

¶ 33.  In this case, Jerrell was handcuffed to a wall and left alone for approximately two hours. He was then interrogated for five-and-a-half more hours before finally signing a written confession prepared by Detective Spano. The duration of Jerrell's custody and interrogation was longer than the five hours at issue in *Haley*, 332 U.S. 596. Indeed, it was significantly longer

than most interrogations.[7] Under these circumstances, it is easy to see how Jerrell would be left wondering "if and when the inquisition would ever cease." *Woods v. Clusen,* 794 F.2d 293, 298 (7th Cir. 1986). Thus, Jerrell's lengthy custody and interrogation is additional evidence of coercive conduct.

¶ 34. The final factor we address is the psychological techniques applied. In *A.M. v. Butler,* 360 F.3d 787, 797 (7th Cir. 2004), an 11–year-old suspect's confession was suppressed after "he was questioned for almost 2 hours in a closed interrogation room with no parent, guardian, lawyer, or anyone at his side." The court expressed concern with the detective's behavior of continually challenging the juvenile's statement and accusing him of lying. *Id.* at 800. It warned that such a technique "could easily lead a young boy to 'confess' to anything." *Id.*

¶ 35. Like the suspect in *A.M.,* Jerrell was subjected to a similar technique for multiple hours. Not only did the detectives refuse to believe Jerrell's repeated denials of guilt, but they also joined in urging him to tell a different "truth," sometimes using a "strong voice" that "frightened" him. Admittedly, it does not appear from the record that Jerrell was suffering from any significant emotional or psychological condition during the interrogation. Nevertheless, we remain concerned that such a technique applied to a juvenile like Jerrell over a prolonged period of time could result in an involuntary confession.

---

[7] In *Inside the Interrogation Room,* 86 J. Crim. L. & Criminology 266, 279 (1996), Richard A. Leo reported that more than 70% of the interrogations he observed lasted less than an hour, and only 8% lasted more than two hours. These figures were taken from a sample of 153 interrogations. *Id.*

¶ 36. Weighing the above personal characteristics against the pressures and tactics used by the police, we determine that the State has not met its burden of proving that Jerrell's written confession was "the product of a free and unconstrained will, reflecting deliberateness of choice." *Hoppe,* 261 Wis. 2d 294, ¶ 36 (citing *Clappes,* 136 Wis. 2d at 236; *Norwood,* 74 Wis. 2d at 364; *Hoyt,* 21 Wis. 2d at 308). Rather, we conclude that it was "the result of a conspicuously unequal confrontation in which the pressures brought to bear on the defendant by representatives of the State exceeded the defendant's ability to resist." *Id.* Accordingly, we determine that the written confession was involuntary under the totality of the circumstances.

## IV

■■■

¶ 37. We turn next to the second issue in this case concerning whether this court should adopt a per se rule, excluding in-custody admissions from any child under the age of 16 who has not been given the opportunity to consult with a parent or interested adult. Jerrell asserts that such a requirement is critical to leveling the playing field between juveniles and the police in an interrogation.

¶ 38. According to Jerrell, the court's warning in *Theriault,* 66 Wis. 2d at 48, has been either ignored or overlooked by courts and law enforcement officers, as evidenced by the facts of this case. Therefore, he asks that we exercise our supervisory authority to adopt such a requirement for the admissibility of a juvenile confession.

¶ 39. The State, by contrast, does not question the merits of the proposed rule. Instead, it questions the court's authority or exercise of authority in adopt-

ing it. The State contends that such a change in law enforcement practices involving custodial interrogation of juveniles is properly a matter for the state legislature and not the court.

¶ 40. Article VII, Section 3 of the Wisconsin Constitution expressly confers upon this court superintending and administrative authority over all state courts.[8] This provision "is a grant of power. It is unlimited in extent. It is indefinite in character." *State v. Jennings*, 2002 WI 44 ¶ 13, 252 Wis. 2d 228, 647 N.W.2d 142 (quoting *State ex rel. Fourth National Bank of Philadelphia v. Johnson*, 103 Wis. 591, 611, 79 N.W. 1081 (1899)).

¶ 41. We have previously described Article VII, Section 3 as establishing " 'a duty of the supreme court to exercise . . . administrative authority to promote the efficient and effective operation of the state's court system.' " *Id.*, ¶ 14 (quoting *In re Grady*, 118 Wis. 2d 762, 783, 348 N.W.2d 559 (1984)). While unquestionably broad and flexible, our supervisory authority will not be invoked lightly. *Id.*, ¶ 15 (citing *In re Phelan*, 225 Wis. 314, 321, 274 N.W. 411 (1937)). Whether we choose to exercise our supervisory authority in a given situation is thus a matter of " 'judicial policy rather than one relating to the power of this court.' " *Id.* (quoting *Phelan*, 225 Wis. at 320).

¶ 42. As indicated above, we are troubled by the tactic of ignoring a juvenile's repeated requests for parental contact. When a detective routinely refuses to

---

[8] Article VII, Section 3, subsection 1 of the Wisconsin Constitution states: "The supreme court shall have superintending and administrative authority over all courts."

call parents when their children are being interrogated, and a circuit court gives that factor little weight in the totality of the circumstances, we certainly take notice.

¶ 43. However, we decline to abandon the "totality of the circumstances" approach at this time in favor of Jerrell's per se rule regarding consultation with a parent or interested adult. Instead, we choose to reaffirm our warning in *Theriault*, 66 Wis. 2d at 48, that the failure "to call the parents for the purpose of depriving the juvenile of the opportunity to receive advice and counsel" will be considered "strong evidence that coercive tactics were used to elicit the incriminating statements." Here, the juvenile was arrested at home. However, we remind law enforcement officials that Wisconsin law requires an "immediate attempt" to notify the parent when a juvenile is taken into custody. Wis. Stat. § 938.19(2).[9]

## V

¶ 44. The final issue we consider is whether to adopt a rule requiring the state to electronically record all juvenile interrogations. To date, two states, Alaska

---

[9] Wisconsin Stat. § 938.19(2) provides:

When a juvenile is taken into physical custody as provided in this section, the person taking the juvenile into custody shall immediately attempt to notify the parent, guardian and legal custodian of the juvenile by the most practical means. The person taking the juvenile into custody shall continue such attempt until the parent, guardian and legal custodian of the juvenile are notified, or the juvenile is delivered to an intake worker under s. 938.20(3), whichever occurs first. If the juvenile is delivered to the intake worker before the parent, guardian and legal custodian are notified, the intake worker, or another person at his or her direction, shall continue the attempt to notify until the parent, guardian and legal custodian of the juvenile are notified.

166

and Minnesota, have mandated an electronic recording requirement by court decision. *Stephan v. State,* 711 P.2d 1156 (Alaska 1985); *State v. Scales,* 518 N.W.2d 587 (Minn. 1994).[10] Jerrell urges this court to follow suit.[11]

¶ 45.  According to Jerrell, a rule requiring electronic recording would provide courts with the best evidence from which it can determine, under the totality of the circumstances, whether a juvenile's confession is voluntary. He views the rule as critical to the integrity of the fact-finding process, as it is difficult to accurately recreate weeks or months later in a courtroom what transpired in a lengthy interrogation like his.

¶ 46.  Again, the State does not take issue with the merits of Jerrell's proposal, but instead questions the court's authority or exercise of authority in adopting it. Additionally, it expresses concern with the court mandating a certain law enforcement practice. The State

[10] The State of New Jersey is also currently considering the matter. On August 10, 2004, its Supreme Court appointed a committee to study and make recommendations concerning electronic recording of custodial interrogations. The recently released report concludes that the New Jersey Supreme Court "should exercise its supervisory authority over the administration of criminal justice to encourage electronic recordation of custodial interrogations." *See* Report of the Supreme Court Special Committee on Recordation of Custodial Interrogations at 36 (April 15, 2005), at http://www.judiciary.state.nj.us/otices/n050505.htm.

[11] Jerrell is joined in this request by the Children and Family Justice Center at Northwestern University School of Law's Bluhm Legal Clinic; Professor Emerita Marygold S. Melli; the Juvenile Justice Center; the Wisconsin Innocence Project of the Frank J. Remington, University of Wisconsin Law School; and 14 other Amici Curiae.

therefore maintains that the debate over electronic recording should occur in legislative chambers.

¶ 47. We are not persuaded by the State's arguments. Here, Jerrell is not asking this court to regulate police practice. Rather, he is requesting a rule governing the admissibility of a juvenile's confession into evidence. This would not make it illegal for police to interrogate juveniles without a recording. Instead, it would render the unrecorded interrogations and any resultant written confession inadmissible as evidence in court.

¶ 48. Plainly, this court has authority to adopt rules governing the admissibility of evidence. For example, we have previously fashioned rules governing the admissibility of polygraph evidence. *E.g., State v. Dean,* 103 Wis. 2d 228, 307 N.W.2d 628 (1981). We have also adopted recording as one of the criteria to consider before admitting hypnotically affected testimony. *State v. Armstrong,* 110 Wis. 2d 555, 329 N.W.2d 386 (1983).

¶ 49. Although the above decisions did not expressly rely upon this court's supervisory power, they make clear that this court can regulate the flow of evidence in state courts, including the nature of the evidence developed and presented by law enforcement. Today, we regulate the evidence of juvenile confessions resulting from custodial interrogations. Like the Minnesota Supreme Court in *Scales,* 518 N.W.2d 587, we do so pursuant to our supervisory authority.

¶ 50. Experiences in Minnesota, Alaska, and hundreds of other jurisdictions that now voluntarily record demonstrate that the benefits of such practice greatly outweigh the costs, both real and perceived. After surveying 238 law enforcement agencies nationwide, Thomas Sullivan, former United States Attorney for the Northern District of Illinois, observed that "[a]

contemporaneous electronic record of suspect interviews has proven to be an efficient and powerful law enforcement tool. Audio is good, video is better. . . . Recordings prevent disputes about officers' conduct, the treatment of suspects and statements they made." See Thomas P. Sullivan, *Police Experiences with Recording Custodial Interrogations,* 6 (Summer 2004), at http://www.law.northwestern.edu/depts./clinic/wrongful/documents/SullivanReport.pdf. Like Sullivan, we agree that electronic recording is an efficient and powerful tool in the administration of justice. We highlight some of these advantages here.

¶ 51. First, a recording requirement will provide courts with a more accurate and reliable record of a juvenile's interrogation. This will eliminate conflicts in evidence that are attributable to flaws in human memory.[12] It will also enable judges to conduct nuanced reviews to resolve admissibility issues. *See, e.g., Hoppe,* 261 Wis. 2d 294, ¶ 27 (in reaching its conclusion about Hoppe's vulnerable mental state, the circuit court explained that "one only needs to listen to the audiotapes to note the impairment referred to by the doctors . . . .").

---

[12] Recent research on the accuracy of interviewers' recollections of interviews with children confirms that memory errors are significant:

> [S]erious errors occur in recall of conversations and interviews with children. These errors are made by interviewers with various levels of training and also with various levels of familiarity with the child. The errors include the omission of details (forgetting) and the commission of details (inserting facts that were not stated), as well as misreporting the degree to which the child's answers were spontaneous or the result of suggestive techniques.

Stephen J. Ceci & Maggie Bruck, *Why Judges Must Insist on Electronically-Preserved Recordings of Child Interviews,* 37 Court Rev. 10, 11 (Summer 2000).

¶ 52. Second, an accurate record will reduce the number of disputes over *Miranda* and voluntariness issues for juveniles. Currently, courts spend an inordinate amount of time and resources wrestling with such slippery matters. This case alone generated four days of hearings based on Jerrell's postdisposition claim that his confession was involuntary. All of these hearings and the entire appellate process might have been avoided if Jerrell's interrogation had been electronically recorded. Not surprisingly, the circuit court twice remarked that it wished it had a videotape of the interrogation.

¶ 53. Third, recording will protect the individual interest of police officers wrongfully accused of improper tactics. Suspects will be unable to contradict an objective record of the interrogation. This is because "viewers and listeners see and/or hear precisely what was said and done, including whether suspects were forthcoming or evasive, changed their version of events, and appeared sincere and innocent or deceitful and guilty." Sullivan, *Police Experiences with Recording Custodial Interrogations,* at 6.

¶ 54. Fourth, a recording requirement will enhance law enforcement interrogations of juveniles. Police report that "[r]ecordings permit detectives to focus on the suspect rather than taking copious notes of the interview. When officers later review the recordings they often observe inconsistencies and evasive conduct which they overlooked while the interview was in progress." *Id.* at 10. Furthermore, "recordings deter officers who might be inclined to engage in improper tactics or misstate what was said or done by the suspect[.]" *Id.* at 16.

¶ 55. Finally, such a rule will protect the rights of the accused. Without a contemporaneous record of the

interrogation, judges are forced to rely on the recollections of interested parties to reconstruct what occurred. The result is often a credibility contest between law enforcement officials and the juvenile, which law enforcement officials invariably win.[13] The existence of an objective, comprehensive, and reviewable record will safeguard juveniles' constitutional rights by making it possible for them to challenge misleading or false testimony.

¶ 56. These reasons have prompted the American Bar Association to unanimously adopt a resolution urging legislatures or courts to enact laws or rules "requiring videotaping of the entirety of custodial interrogations of crime suspects at police precincts, courthouses, detention centers, or other places where suspects are held for questioning, or, where videotaping is impractical, to require the audiotaping of such custodial interrogations[.]" American Bar Ass'n, N.Y. County Lawyers' Ass'n, Criminal Justice Section, Report to the House of Delegates (Feb. 2004), available at http://www.abanet.org/leadership/2004/recommendations/8a.pdf.

, ¶ 57. We are mindful that adopting the rule proposed by Jerrell will be met with some hesitation.[14]

---

[13] In this case, Detective Spano and Jerrell gave conflicting testimony on many accounts of the interrogation, including: (1) whether Detective Spano gave Jerrell *Miranda* warnings at all; (2) whether Detective Spano promised Jerrell that he would go home after a night in detention, or merely stated that he did not know what would happen after that night; (3) whether Detective Spano threatened Jerrell with 65 years in prison if he did not confess; and (4) whether police told Jerrell some details of the robbery. The circuit court resolved all of these differences in favor of Detective Spano.

[14] For example, some may fear that a recording requirement will lead to suppression of confessions based on technicalities. We note, however, that jurisdictions that require re-

However, we agree with the court of appeals that "it is time for Wisconsin to tackle the false confession issue" and "take appropriate action so that the youth of our state are protected from confessing to crimes they did not commit." *Jerrell C.J.,* 269 Wis. 2d 442, ¶ 32. We are convinced than an electronic recording requirement is a means to that end.

¶ 58.   In 1994, the Minnesota Supreme Court in *Scales,* 518 N.W.2d at 592, exercised its "supervisory power to insure the fair administration of justice." It required electronic recording of all questioning "where feasible," and without exception "when questioning occurs at a place of detention." *Id.* Today, we also exercise our supervisory power to insure the fair administration of justice. All custodial interrogation of juveniles in future cases shall be electronically recorded where feasible, and without exception when questioning occurs at a place of detention. Audiotaping is sufficient to satisfy our requirement; however, videotaping may provide an even more complete picture of what transpired during the interrogation.[15]

cording have excused the failure to record when that failure was occasioned by good faith error or equipment malfunction or where the violation was not substantial or the contents of the interrogation were not in dispute. *See, e.g., Bright v. State,* 826 P.2d 765, 773–74 (Alaska Ct. App. 1992); *State v. Miller,* 573 N.W.2d 661, 674–75 (Minn. 1998); *State v. Schroeder,* 560 N.W.2d 739, 740–41 (Minn. Ct. App. 1997).

[15] For many law enforcement agencies in this state, this practice will be nothing new. At oral argument, the Assistant Attorney General indicated that there are approximately 50 law enforcement agencies in the state that do taping of some type under some set of circumstances.

## VI

¶ 59. In sum, we agree with Jerrell that his written confession to the police was involuntary under the totality of the circumstances. However, we decline to adopt his proposed per se rule regarding consultation with a parent or interested adult. Finally, we exercise our supervisory power to require that all custodial interrogation of juveniles in future cases be electronically recorded where feasible, and without exception when questioning occurs at a place of detention. Accordingly, we reverse the decision of the court of appeals.

*By the Court.*—The decision of the court of appeals is reversed.

¶ 60. SHIRLEY S. ABRAHAMSON, C.J. (*concurring*). I join the majority opinion. I agree that the written confession was involuntary and that the decision of the court of the appeals should be reversed. I wholeheartedly join the court in adopting a rule requiring police to record electronically all juvenile interrogations.

¶ 61. I write for two reasons. First, I write to discuss the court's state constitutional superintending authority over all courts. As I describe below, for more than 120 years of Wisconsin state constitutional history, from 1853 to 1977, the supreme court broadly construed its superintending authority as a power to control litigation in the courts. In 1977 the legislature and the people of the state of Wisconsin, presumably aware of this constitutional history, amended the judiciary article of the Wisconsin constitution, thereby giving their imprimatur to the court's broad constitutional superintending power to control litigation. Since the 1977 constitutional amendment the court has contin-

173

ued to take a broad view of its superintending authority. Accordingly, I conclude that the majority opinion fits well within the court's constitutional powers.[1]

¶ 62.  Second, unlike the majority, I would adopt a per se rule excluding in-custody admissions from any child under the age of 16 who has not been given the opportunity to consult with a parent or interested adult.

¶ 63.  The court of appeals,[2] the defendant,[3] the Children and Family Justice Center at Northwestern University School of Law's Bluhm Legal Clinic,[4] the

---

[1] Justices Ann Walsh Bradley, N. Patrick Crooks, and Louis B. Butler join only Part I of this concurrence relating to the court's superintending authority, making Part I the decision of the majority of the court regarding the nature of the court's superintending authority over all courts.

[2] *State v. Jerrell C.J.*, 2004 WI App 9, ¶ 32, 269 Wis. 2d 442, 674 N.W.2d 607 (issuing a call for action).

[3] Brief and Appendix of Respondent-Appellant-Petitioner at 30–34. The defendant and the court of appeals suggest adoption of the rule set forth in *In re E.T.C.*, 449 A.2d 937 (Vt. 1982). *See Jerrell C.J.*, 269 Wis. 2d 442, ¶ 31.

The Vermont Supreme Court in *E.T.C.*, 449 A.2d at 940, adopted the following criteria for a juvenile to voluntarily and intelligently waive his right against self-incrimination and right to counsel:

> (1) [H]e must be given the opportunity to consult with an adult; (2) that adult must be one who is not only genuinely interested in the welfare of the juvenile but completely independent from and disassociated with the prosecution, e.g., a parent, legal guardian, or attorney representing the juvenile; and (3) the independent interested adult must be informed and be aware of the rights guaranteed to the juvenile.

[4] *See* Brief of Amicus Curiae Children & Family Justice Center, Professor Emerita Marygold S. Melli, & The Juvenile Law Center.

Juvenile Law Center,[5] and University of Wisconsin Law School Professor Marygold S. Melli[6] all agree that it is time to take appropriate action to protect the youth of our state from confessing to crimes they did not commit.

¶ 64. The State does not question the merits of a per se rule,[7] but argues that the formulation of such a rule should be left to the legislature, as a matter of policy, just as it argues that formulation of a rule requiring electronic recording of juvenile interrogations should be left to the legislature. For the same reasons set forth in the majority opinion and in this concurring opinion for rejecting the State's argument about comparative judicial-legislative institutional competence relating to electronic recording,[8] I reject the State's leave-it-to-the-legislature approach on this parental issue.

## I

¶ 65. The other concurrences' challenge to the court's exercise of its superintending powers in the instant case prompted me to reexamine the cases and impelled me to write. I disagree with their views of the court's powers. I view the exercise of superintending powers in the instant case as a means of controlling the course of litigation in the courts of this state by governing the admission of evidence;[9] the court's exercising its superintending power here is a question of policy, not power.

---

[5] *See id.*

[6] *See id.*

[7] Majority op., ¶ 39.

[8] Majority op., ¶¶ 47–49.

[9] *See, e.g., State v. Armstrong,* 110 Wis. 2d 555, 329 N.W.2d 386 (1983) (altering the rules regarding admissibility of hyp-

¶ 66.   The powers of the Wisconsin Supreme Court are defined in several ways and have diverse origins. Some are explicitly set forth in Article VII, Section 3 of the Wisconsin Constitution: appellate and original jurisdiction and superintending and administrative authority. Others are derived from the state constitutional separation of powers doctrine, as well as from the court's very existence, especially this court's being the highest court in the state, the court of last resort. Indeed, "it is well established that this court has express, inherent, implied and incidental powers"[10] to

notically affected evidence); *State v. Dean,* 103 Wis. 2d 228, 307 N.W.2d 628 (1981) (polygraph evidence inadmissible).

[10] *State v. Holmes,* 106 Wis. 2d 31, 45, 315 N.W.2d 703 (1982).

I agree with Justice Prosser's concurrence that "[i]t is not completely clear how the court's 'superintending authority' differs from the court's inherent power, for the two powers sometimes overlap." Justice Prosser's concurrence/dissent, ¶ 136.

This court has grouped inherent power with implied and incidental powers and has defined them as those powers that are necessary "to enable the judiciary to accomplish its constitutionally or legislatively mandated functions." *State ex rel. Friedrich v. Circuit Court for Dane County,* 192 Wis. 2d 1, 16, 531 N.W.2d 32 (1995) (quoting *State v. Holmes,* 106 Wis. 2d 31, 44, 315 N.W.2d 703 (1982) (quoting *State v. Cannon,* 199 Wis. 401, 402, 226 N.W. 385 (1929))).

For a discussion of the supreme court's powers, see Comment, *Inherent Power and Administrative Court Reform,* 58 Marq. L. Rev. 133, 135–36 (1974); Dennis Gallagher, Comment, *Superintending Power of the Wisconsin Supreme Court and Financial Disclosure Rules for Judges,* 1977 Wis. L. Rev. 1111; Wis. Legislative Reference Bureau, *The Powers of the Wisconsin Supreme Court* (Res. Bull. 76–RB-1, 27–33). For a listing of Wisconsin cases and commentaries discussing court powers, see

manage the sound operation of the judicial system in our tripartite form of government.

¶ 67. Superintending, inherent, implied, and incidental powers should, as the court has often said, and as I strongly believe, be "invoked cautiously and with a minimum of rhetoric to reduce the risks of conflicts with the legislative and executive branches of government."[11] Our superintending power is not lightly invoked.[12]

¶ 68. The other concurrences in the instant case set forth an erroneous and cramped view of the powers of this court based on their incomplete historical review of selectively chosen case law.

¶ 69. When all is said and done, *Arneson v. Jezwinski*, 206 Wis. 2d 217, 225–26, 556 N.W.2d 721 (1996), quoted with approval in *State ex rel. Hass v. Wisconsin Court of Appeals*, 2001 WI 128, 248 Wis. 2d 634, 640, 636 N.W.2d 707 (2001), summarizes the case law interpreting our superintending authority and sets forth the present and long-standing view that the court's superintending authority is a broad power to be exercised for controlling the course of litigation and is shaped by the continuing necessity that this court carry out its function as a supreme court.[13] The *Arneson* court wrote as follows:

---

*State ex rel. Friedrich v. Circuit Court for Dane County* 192 Wis.2d 1, 16, 531 N.W.2d 32 (1995).

[11] Gallagher, *supra* note 10, at 1124 (citing John M. Connors, *Inherent Power of the Courts—Management Tool or Rhetorical Weapon?*, 1 Justice System J. 63, 65–68 (1973)).

[12] *Arneson v. Jezwinski*, 206 Wis. 2d 217, 226, 556 N.W.2d 721 (1996).

[13] *See also State v. Jennings*, 2002 WI 44, ¶¶ 12–16, 99, 252 Wis. 2d 228, 647 N.W.2d 142 (The court unquestionably has the

The Wisconsin Constitution grants three separate and distinct branches of jurisdiction to this Court: (1) appellate jurisdiction; (2) general superintending control over inferior courts; and (3) original jurisdiction at certain proceedings at law and in equity. Wis. Const. art VII, § 3; *State ex rel. Reynolds v. County Court*, 11 Wis. 2d 560, 564, 105 N.W.2d 876 (1960); *In re Brand*, 251 Wis. 531, 536, 30 N.W.2d 238 (1947), *cert. denied*, 335 U.S. 802, 69 S. Ct. 34, 93 L. Ed. 359 (1948); *State ex rel. Fourth Nat'l Bank v. Johnson*, 103 Wis. 591, 611–12, 79 N.W. 1081 (1899) (hereinafter *"Johnson"*). The constitutional grants of superintending authority endow this court with a power that is indefinite in character, unsupplied with means and instrumentalities, and limited only by the necessities of justice. *In re Kading*, 70 Wis. 2d 508, 519–20, 235 N.W.2d 409, 238 N.W.2d 63, 239 N.W.2d 297 (1975); *Reynolds*, 11 Wis. 2d at 564–65, 105 N.W.2d 876; *In re Phelan*, 225 Wis. 314, 320–21, 274 N.W. 411 (1937); *Johnson*, 103 Wis. at 611, 79 N.W. 1081. In addition, this power enables the court to control the course of ordinary litigation in the lower courts of Wisconsin. *Phelan*, 225 Wis. at 320, 274 N.W. 411; *Johnson*, 103 Wis. at 613, 79 N.W. 1081. As we have stated, "The superintending power is as broad and as flexible as necessary to insure the due administration of justice in the courts of this state." *Kading*, 70 Wis. 2d at 520, 235 N.W.2d 409.

However, we do not use such power lightly. *Phelan*, 225 Wis. at 321, 274 N.W. 411. As we have indicated, "'This court will not exercise its superintending power where there is another adequate remedy, by appeal or otherwise, for the conduct of the trial court, or where the conduct of the trial court does not threaten seriously to impose a significant hardship upon a citizen." *McEwen v. Pierce County*, 90 Wis. 2d 256, 269–70, 279

power to require the court of appeals to certify to this court any case presenting a conflict between our precedent and a decision of the U.S. Supreme Court.).

N.W.2d 469 (1979) (citing *Newlander v. Riverview Realty Co.,* 238 Wis. 211, 225, 298 N.W. 603 (1941); *State ex rel. Tewalt v. Pollard,* 112 Wis. 232, 234, 87 N.W. 1107 (1901)).[14]

¶ 70.  Let me explain the basis for the *Arneson* precis of superintending authority. A careful examination of Article VII, Section 3 and the case law shows the development of the court's views about superintending power, culminating in the 1977 constitutional amendment. The court has examined and reexamined the basis of the superintending power over the years and has defined and redefined the power. The court's conceptualization ends where it began: The court's superintending power is as broad as necessary to meet the needs of changing circumstances, and that power is to be exercised judiciously. The question of this court's exercising its superintending authority over the courts and litigation "is one of policy, not power."[15]

¶ 71.  The analysis starts with the language of Article VII, Section 3 of the 1848 constitution, then considers the adoption of the 1977 constitutional amendment to Article VII, Section 3, and culminates with recent cases interpreting the constitutional grant of superintending authority.

¶ 72.  Article VII, Section 3 of the 1848 constitution regarding superintending control read as follows:

The supreme court, except in cases otherwise provided in this constitution, shall have appellate jurisdiction only, which shall be coextensive with the state; but in no case removed to the supreme court shall a trial by a jury be allowed. *The supreme court shall have a general*

---

[14] *Arneson,* 206 Wis. 2d at 225–26.

[15] *State ex rel. Hass v. Wis. Court of Appeals,* 2001 WI 128, ¶ 12, 248 Wis. 2d 634, 636 N.W.2d 707.

*superintending control over all inferior courts; it shall have power to issue writs of habeas corpus, mandamus, injunction, quo warranto, certiorari, and other original and remedial writs, and to hear and determine the same* (emphasis added).

After the 1977 constitutional amendment, the grant of superintending control in Article VII, Section 3(1), which governs the instant case, reads simply as follows:

The Supreme Court shall have superintending and administrative authority over all courts.[16]

¶ 73.    The 1848 constitution's words "superintending control over all inferior courts" are broad and unlimited. The 1848 Wisconsin constitutional documents do not help us in understanding the meaning of "superintending control." We therefore turn to contemporaneous interpretations of the 1848 Constitution as a source of its meaning. Contemporaneous legislative or judicial interpretations of the state constitution have special value.[17] The legislators or judges who were on hand when the constitution was adopted have a unique

_____

[16] The 1977 amendment removed the reference to writs from the supreme court's superintending power. Writs are referred to in Article VII, Section 3(2) as follows: "The supreme court has appellate jurisdiction over all courts and may hear original actions and proceedings. The supreme court may issue all writs necessary in aid of its jurisdiction."

[17] The court in *State v. Beno,* 116 Wis. 2d 122, 136–37, 341 N.W.2d 668 (1984), and in other cases, has recognized that when the plain meaning of words is not helpful in constitutional interpretation, contemporaneous authority is the next best interpretive tool. Constitutional interpretation involves

(1) The plain meaning of the words in the context used; (2) The historical analysis of the constitutional debates and of what practices were in existence in 1848, which the court may reasonably presume were also known to the framers of the 1848 consti-

perspective. They ought to know what the constitution means. On the issue of the court's superintending power, we have a contemporaneous judicial interpretation and that interpretation should be given great weight.

¶ 74.   In 1853, five years after the adoption of the Wisconsin Constitution, Justice Adam Smith, writing for the court in *The Attorney General v. Blossom,* 1 Wis. 277 [*317] (1853), addressed the meaning of "superintending control" in a case involving the court's power to issue a writ of quo warranto. *Blossom,* like cases to follow, was concerned with the relation of superintending control to the writs specified in the constitution.

¶ 75.   Writing for a unanimous court, Justice Smith interpreted the phrase "superintending control over all inferior courts" as a broad grant of power to the supreme court. The court's power would, he wrote, be interpreted over the years to enable the court to fulfill its role as the court of last resort in the state.[18]

tution; and (3) The earliest interpretation of this section by the legislature as manifested in the first law passed following the adoption of the constitution. (Citations omitted.)

[18] Justice Smith wrote as follows:

It is obvious, then, that when the framers of the constitution speak of a supreme court, they intended to convey the idea of the highest tribunal in the judicial department of the government.

. . . .

. . . "The supreme court shall have a general superintending control over all inferior courts."

. . . .

After the words "inferior courts," there is a period. The sentence is as complete and independent as is the first sentence which speaks of the appellate jurisdiction of the supreme court.

. . . .

Although Justice Smith viewed the constitutional "superintending" language as a grant of power, he asserted that the clause may have been unnecessary because this power might be arrived at by implication.[19]

¶ 76. To add weight to his persuasive reasoning, Justice Smith reminded his readers that a justice of the court joining his opinion had been a member of the judiciary committee that reported the judiciary article at the constitutional convention.[20]

¶ 77. Justice Smith's broad interpretation of the court's superintending power was echoed 21 years later by Chief Justice Edward Ryan, in *The Attorney General v. Railroad Cos.,* 35 Wis. 425 (1874). Chief Justice Ryan was a prominent member of the 1846 constitutional

---

> This sentence contains a clear grant of power. We will not undertake to say that without this grant, the power would not be in the court. It is not necessary to discuss that question. We are endeavoring to arrive at the proper construction of the written law. It is a grant of power. It is unlimited in extent. It is undefined in character. It is unsupplied with means and instrumentalities. The constitution leaves us wholly in the dark as to the means of exercising this clear, unequivocal grant of power. It gives, indeed, the jurisdiction, but does not pretend to intimate its instruments or agencies. . . .

*The Attorney General v. Blossom,* 1 Wis. 277 [*317], 281–83 [*322–25] (1853).

[19] *Blossom,* 1 Wis. at 284 [*326]:

> The very force of the terms, supreme court; comprehending, naming, instituting the highest, the *dernier* judicial tribunal known to, and recognized by the common law, necessarily carries with it all the writs, instrumentalities, powers and agencies provided by the common law for the convenient and complete exercise of such superintending control. It is idle to say that the enumeration of such writs as are mentioned, were made to supply such means of superintending control.

[20] *Blossom,* 1 Wis. at 289 [*332].

convention.[21] Chief Justice Ryan, writing for a unanimous supreme court, wrote that the constitutional grant is

> to the supreme court of the state, in the full significance of that term given in *Attorney General v. Blossom;* designed to have a general judicial oversight of the state in all its interests, public and private. To this court, as such, are given general appellate jurisdiction and superintending control over all other courts throughout the state, because these are essential to the judicial supremacy of the court in all ordinary litigation . . . .[22]

Chief Justice Ryan explained that the appellate, original, and superintending jurisdiction of the court all had one underlying policy: "to make this court indeed a supreme judicial tribunal over the whole state; a court of last resort on all judicial questions under the constitution and laws of the state . . . ."[23]

¶ 78. Justice Smith's and Chief Justice Ryan's broad interpretation of superintending authority in the *Blossom* and the *Railroad Cos.* cases became the accepted view after judicial meanderings along other paths, one of which I discuss below.

---

[21] Wisconsin Supreme Court, *Portraits of Justice: The Wisconsin Supreme Court's First 150 Years* 16 (2d ed. 2003), available online at http://wicourts.gov/about/pubs/supreme/docs/ portraitsofjustice.pdf.

[22] *The Attorney General v. Railroad Cos.,* 35 Wis. 425, 518 (1874).

[23] *Railroad Cos.,* 35 Wis. at 518.

Although *State ex rel. Fourth Nat'l Bank v. Johnson,* 103 Wis. 591, 611–12, 79 N.W. 1081 (1899) limited the court's superintending power to correcting jurisdictional errors, later cases clarified that the power extended to judicial errors. *State ex rel. Umbreit v. Helms,* 136 Wis. 432, 450–52 (1908) (Marshall, J., concurring).

¶ 79. One such meandering was Justice Winslow's unanimous opinion for the court in *State ex rel. Fourth National Bank of Philadelphia v. Johnson,* 103 Wis. 591, 79 N.W. 1081 (1899). Justice Winslow quoted *Blossom's* and *Railroad Cos.'* broad interpretations of superintending control but added a spin to these cases. Justice Winslow looked to English law (as had Justice Smith in *Blossom*)[24] and seemed to take a narrower view of superintending control, emphasizing the use of writs specified in the exercise of superintending control to keep courts within their jurisdiction and compel action when courts failed to exercise jurisdiction.[25] Justice Winslow's opinion seems to make a distinction between using the superintending power to correct jurisdictional errors of lower courts and using the superintending power to correct other judicial errors.

¶ 80. A second case following the *Johnson* path was *Seiler v. State,* 112 Wis. 293, 87 N.W. 1072 (1901), which Justice Roujet D. Marshall wrote for the court. Although the *Seiler* court stated that the nature of superintending control was decided by the *Blossom, Railroad Cos.,* and *Johnson* cases, Justice Marshall's *Seiler* opinion seems to follow the theme of the *Johnson* case limiting superintending control to English practice.[26]

---

[24] Justice Smith discussed England's King's Bench in order to shed light on the history of writs specified in the original version of Article VII, Section 3. *See Blossom,* 1 Wis. at 277–280 [\*318–21].

[25] *See* John D. Wickhem, *The Power of Superintending Control of the Wisconsin Supreme Court,* 1941 Wis. L. Rev. 153, 164–65.

[26] *Seiler v. State,* 112 Wis. 293, 299–301, 87 N.W. 1072 (1901).

¶ 81. The *Johnson* and *Seiler* cases apparently misinterpreted Justice Smith's discussion of the King's Bench in *Blossom* to suggest that the powers of the English King's Bench defined the superintending powers of the state supreme court. The justices returned, however, to the principles of *Blossom,* repudiating the narrower *Johnson-Seiler* King's Bench path, in *State ex rel. Umbreit v. Helms,* 136 Wis. 432, 118 N.W. 158 (1908). The views regarding the scope of the court's power set forth in the concurrences of *Helms* are essentially the way this court has viewed its superintending power since that case. In *Helms,* the supreme court was asked to exercise its superintending control by directing a circuit court judge to set aside his order quashing and dismissing a criminal complaint. Justice Kerwin, writing for the court, declared it unnecessary to write much on the meaning of superintending control. Justice Marshall and Chief Justice Winslow took the opportunity in concurring opinions to express their views on superintending control in an attempt to settle what they viewed as a festering interpretive issue.

¶ 82. In a concurring opinion with a lengthy historical synopsis, Justice Marshall, the author of *Seiler,* sought to put to rest the meaning of "superintending power."[27] Justice Marshall endorsed the *Blossom* and *Railroad Cos.* cases, adopting their broad view of superintending power rather than the narrow view he appeared to express in *Seiler.*[28] Justice Marshall did

---

[27] *Helms,* 136 Wis. at 442 (Marshall, J., concurring).

[28] *Helms,* 136 Wis. at 449 (Marshall, J., concurring):

Its broad and comprehensive character was emphasized at many points, the idea being made prominent that the instrumentalities for its exercise were to be discovered or invented, if need be, the power itself not to fail of efficiency in any given situation because of the ordinary restrictions upon the use of any particular writ or

not, however, view the *Johnson* case as narrowing the scope of the *Blossom* and *Railroad Cos.* interpretations.

¶ 83.   Chief Justice Winslow, the author of the *Johnson* case, also separately concurred in *Helms.* Although he interpreted *Johnson* as holding that superintending control meant the power exercised by the English court of King's Bench and not extending to all cases of judicial error, Chief Justice Winslow graciously backed away from this view in order to achieve, as he wrote, court unanimity. Chief Justice Winslow wrote as follows:

> The majority of my brethren, however, hold that, even if my view of the English rule be correct (which they do not concede), still this court in the first *Johnson Case* took a much broader ground . . . . Upon mature reflection and with some hesitation I have yielded to this view, not because I have become convinced of error in my first conclusion, but chiefly because it has seemed to me eminently desirable that a troublesome question which has been frequently presented to us of late   .

writs; that the constitutional grant was both "compact and congruous in itself," with its own "uniform group of analogous remedies" to be exercised in ways of its own "on many objects, in great variety of detail." . . . No suggestion is found up to this point that the concept of the constitution makers, as understood by this court, was based upon any model or any idea other than that to so round out supreme judicial authority as to afford a means in any given circumstances of preventing a denial of justice.

*See also* John D. Wickhem, *The Power of Superintending Control of the Wisconsin Supreme Court,* 1941 Wis. L. Rev. at 165–66 (J. Marshall expressly held that the power of superintending control extends into field of judicial error; C.J. Winslow deferred to the court's conclusion that the case is governed by *Johnson,* although as an original proposition he would not have extended the superintending power to cases of judicial review; J. Dodge took the view that superintending power, as it existed in the King's Bench, included the power to review all preliminary questions needing to be decided before an inferior court could consider the merits of the case).

should be definitely and clearly settled with as great unanimity as possible.

. . . .

It is not to be supposed that the constitution conferred the power of superintending control on this court to be used as a sort of an addition to the ordinary appellate jurisdiction in ordinary litigation, but rather as an extraordinary power to be wisely used only in cases where there has been a miscarriage of justice involving important public rights or great and widely extended private interests.[29]

¶ 84. Thus the court in *Helms* resolved the question of the interpretation of superintending control in favor of the broad view of the power expressed in *Blossom*.

¶ 85. The concurrences in the instant case tenaciously hang on to the limited view of superintending power expressed in *Johnson* and *Seiler* relying on English law, even though Justice Winslow, the author of the English King's Bench limited view of superintending control in *Johnson*, backed away from this narrow interpretation.

¶ 86. Justice John D. Wickhem summarized the case law in a law review article using the following words, words very similar to those used by the court recently in *Arneson*, quoted above:

The first and principal purpose of the constitutional grant is to insure protection of the rights of persons as litigants.

. . . .

[T]he field of superintendence [is] not lightly entered . . . .

---

[29] *Helms,* 136 Wis. at 464–65 (Winslow, C.J., concurring).

. . . .

Many elements enter into the question whether the court in any given instance ought to exercise that power.

. . . .

The merits of each case must be considered in light of the objectives of the grant and the necessary limitations upon its exercise.

. . . .

The later cases hold that an exercise of the court's superintending control may be justified in spite of the fact that a determination of the duty of the inferior court and the scope of the petitioner's rights may present difficult and close questions of law.

. . . .

[T]here were [in the cases] serious differences of opinion as to rationale, but that the tendency of the court was to liberalize the rule.[30]

¶ 87. Using inherent, implied, or superintending power, or a combination thereof, the court has in the latter part of the 20th century exercised its power over courts, judges, and attorneys to protect the state, the public, the litigants, and the due administration of justice. For example, the court adopted a unified bar and compelled payment of fees,[31] and has promulgated[32] and enforced a Code of Judicial Ethics.[33]

[30] John D. Wickhem, *The Power of Superintending Control of the Wisconsin Supreme Court,* 1941 Wis. L. Rev. at 162–66.

[31] *In re Integration of the Bar,* 249 Wis. 523, 25 N.W.2d 500 (1946).

[32] *In the Matter of the Promulgation of a Code of Judicial Ethics,* 36 Wis. 2d 252, 153 N.W.2d 873 (1967).

¶ 88. Against the contention that the court's inherent power is limited to regulation of attorneys and the physical operation of the courtroom and not the regulation of judges, Chief Justice Wilkie (and three of his colleagues) upheld the court's Code of Judicial Ethics in *In re Kading*, 70 Wis. 2d 508, 235 N.W.2d 409 (1975), harkening back to the *Blossom* and *Railroad Cos.* cases by stating that the "inherent power of this court is shaped, not by prior usage, but by the continuing necessity that this court carry out its function as a supreme court."[34] In using the court's superintending power as a justification for the adoption and enforcement of the Code of Judicial Ethics, Chief Justice Wilkie concluded that that the "superintending power is as broad and as flexible as necessary to insure the due administration of justice in the courts of this state." Chief Justice Wilkie wrote:

> If this power were strictly limited to the situations in which it was previously applied [that is, as Judge Kading contended, to control courts in matters between parties to a litigation], it would cease to be superintending, since this word definitely contemplates ongoing, continuing supervision in response to changing needs and circumstances. The power of superintending control should not be ossified by an unduly restrictive interpretation of its extent.[35]

¶ 89. The Chief Justice asserted that the Code protects the rights of all litigants. "If the superintending power can be used to protect particular parties to a

---

[33] *In re Kading*, 70 Wis. 2d 508, 235 N.W.2d 409 (1975).

[34] *Id.* at 519.

[35] *Id.* at 520.

particular litigation, then surely it can be used to protect the rights of litigants in general."[36]

¶ 90. The dissenters in *Kading* disagreed with the court's view of its superintending power, relying on the discarded English King's Bench version of superintending control in *Seiler* and *Johnson*.[37] A law student comment by Dennis Gallagher, relying on the repudiated *Seiler* case, erroneously gives credence to the dissenters' position.[38] The dissent in *Kading* is better understood as an objection as a matter of policy to the use of the court's inherent and superintending powers to adopt a Code of Judicial Ethics rather than as a persuasive discussion of the court's power.

¶ 91. To summarize the cases pertaining to the court's superintending power through the 1970s: The 1853 *Blossom* court declared that the superintending power is as broad as necessary to control litigation and the rights of litigants; the writs named in the third grant of power in the constitutional article are not necessarily the only means for exercising superintending power. The *Johnson* and *Seiler* cases appear to have limited the court's superintending control to the power

---

[36] *Id.*

[37] *Id.* at 537–40 (Hansen, J., dissenting).

[38] Gallagher, *supra* note 10, at 1120.

One problem with Gallagher's comment stems from his view that when it instituted a Code of Judicial Ethics, the supreme court had gone beyond its superintending powers to control "all members of the judiciary, not only as lawyers but also as 'judicial officers in a court system constituting the judicial branch of the state government. . . .' " Gallagher, *supra* note 10, at 1119 (citing *Code of Judicial Ethics,* 36 Wis. 2d 252, 254, 153 N.W.2d 873, 873 (1968)). The court's action should be seen instead as controlling the course of litigation in inferior courts, a power well within its superintending authority.

used by the English court of the King's Bench. The concurring opinions in *Helms* (including one by Justice Winslow, who authored *Johnson*) returned to the views expressed in *Blossom* and interpreted the *Johnson* case broadly. The majority of the court in the *Kading* case enforcing the Code of Judicial Ethics followed the broad interpretation of the court's superintending power as first enunciated in 1853 in the *Blossom* case.

¶ 92.   The judiciary article of the Wisconsin Constitution was amended in 1977. The supreme court's superintending authority was placed in a one-sentence subsection separated from the other subsections granting appellate and original jurisdiction and separated from any reference to writs. Article VII, Section 3(1) of the 1977 amendment reads simply as follows regarding the court's superintending powers: "The supreme court shall have superintending and administrative authority over all courts."

¶ 93.   Thus, in 1977, presumably aware of the historical case law interpreting the 1848 constitution and the court's exercise of superintending power to adopt and enforce the Code of Judicial Ethics, the legislature and the people of the state decoupled the court's superintending authority over all state courts from the writs specified in the 1848 constitution and thereby gave their imprimatur to the court's historical interpretation of the 1848 language attributing to the court broad constitutional superintending power to control litigation. Thus, the 1977 constitutional amendment implemented Justice Adam Smith's broad explication of the court's superintending power set forth in the *Blossom* case and in Chief Justice Wilkie's opinion in *Kading*.

¶ 94.   Thereafter, this court has adhered to this understanding of its superintending power. Thus the

recent *Arneson* and *Hass* cases follow the broad interpretation of the constitutional superintending authority enunciated in *Blossom* and subsequent cases and embodied in the 1977 constitutional amendment.

¶ 95. The present case fits within the historical understanding of the constitutional grant of superintending power to this court and the 1977 constitutional amendment and is, in my view on balancing all the equities, a prudent exercise of the court's power to control the course of litigation in the courts of this state.

## II

¶ 96. I also write separately to explain why the majority opinion's holding that an adult's presence is a significant factor under the totality of circumstances test does not go far enough. I would adopt a per se rule excluding in-custody admissions from any child under the age of 16 who has not been given the opportunity to consult with a parent or interested adult. Here are my top 8 (interrelated and overlapping) reasons for adopting a per se rule:

¶ 97. *Reason No. 1.* A per se rule should be adopted because Wisconsin law enforcement officers have not heeded the warning this court issued 30 years ago in *Theriault v. State,* 66 Wis. 2d 33, 223 N.W.2d 850 (1974), that law enforcement's failure to call a juvenile's parents would be viewed as "strong evidence that coercive tactics were used to elicit the incriminating statements."[39] In addition to our admonishment in *Theriault,* in 1981 a Milwaukee County circuit court "berated

---

[39] *Theriault v. State,* 66 Wis. 2d 33, 48, 223 N.W.2d 850 (1974).

the [Milwaukee] police department for not notifying the defendant's parents in order to give them an opportunity to be present during the police questioning."[40] As the present case demonstrates, the long-time practice of Milwaukee police officers to exclude parents from the interrogation of juveniles has continued. Despite *Theriault* and the Milwaukee County circuit court's admonishment, the practice of excluding parents during juvenile interrogation is apparently widespread throughout the state.[41]

¶ 98. *Theriault* and the Milwaukee County Circuit Court's admonishment obviously have not changed police practices, and there is no reason to think a second clarion call by this court re-announcing *Theriault*'s totality of the circumstances rule will change police practices, especially when a leading police interrogation manual recommends that police interrogate suspects in privacy whenever possible.[42]

¶ 99. *Reason No. 2.* A per se rule should be adopted because Wisconsin courts have not heeded this court's warning from *Theriault* that law enforcement's failure to call a juvenile's parents would be viewed as

---

[40] *In re C.W.,* No. 1980AP1844, unpublished slip op. at 2 (Wis. Ct. App. May 7, 1981).

[41] *See, e.g.,* the present case (14–year-old, Milwaukee County); *In re C.W.,* No. 1980AP1844, unpublished slip op. (Wis. Ct. App. May 7, 1981) (12–year-old, Milwaukee County); *State v. Campbell,* No. 1980AP2136–CR, unpublished slip op. (Wis. Ct. App. March 16, 1982) (17–year-old, Forest County); *State v. Glotz,* No. 1983AP1792–CR, unpublished slip op. (Wis. Ct. App. Dec. 27, 1984) (17–year-old, LaCrosse County); *R.E.W. v. State,* No. 1986AP471, unpublished slip op. (Wis. Ct. App. Oct. 16, 1986) (14–year-old, Rock County).

[42] *See* Fred E. Inbau et al., *Criminal Interrogation and Confessions* 51–56, 521 (4th ed. 2001).

"strong evidence that coercive tactics were used to elicit incriminating statements."[43] Courts have inconsistently applied the totality of circumstances test and have tended to haphazardly exclude only the most egregiously obtained confessions.[44] A fair reading of the Wisconsin cases demonstrates that Wisconsin courts (including this court) do not consider law enforcement's failure to call a juvenile's parents or an interested adult as strong or even some evidence of coercive tactics.[45]

---

[43] *Theriault,* 66 Wis. 2d at 48.

[44] *See* Barry C. Feld, *Bad Kids* 118–19 (1999).

*See In re B.M.B.,* 955 P.2d 1302 (Kan. 1998), in which the Kansas supreme court adopted a per se rule because the prosecution and trial court in that case gave only lip service to the factors in the totality of circumstances test.

For the haphazard pattern in Wisconsin cases, see cases at note 45, *infra.*

[45] For court of appeals cases giving short shrift to *Theriault* without even mentioning its "strong evidence" language, see, *e.g., State v. Michael G.,* No. 2000AP1435, unpublished slip op. at 1 (Wis. Ct. App. Oct. 3, 2000) ("[P]arental presence is only one factor to consider and is not an absolute prerequisite."); *State v. Rea,* No. 1994AP2460–CR, unpublished slip op. at 4 (Wis. Ct. App. April 16, 1996) ("[P]resence of a parent or an attorney is not required to validate a juvenile's waiver."); *State v. Glotz,* 122 Wis. 2d 519, 523, 362 N.W.2d 179 (Ct. App. 1984) (noting that "reasonable expectation" language in *Theriault* does not apply and that circuit court's finding that juvenile confessed because police said witnesses could identify him was reasonable); *State v. Campbell,* No. 1980AP2136–CR, unpublished slip op. at 2 (Wis. Ct. App. March 16, 1982) ("The absence of a parent is but one of the factors making up the totality of the circumstances."); *In re C.W.,* No. 1980AP1844, unpublished slip op. at 1 (Wis. Ct. App. May 7, 1981) ("[T]he presence of parents or an attorney is not an absolute requirement for the minor [a 12–year-old] to validly waive his right to remain silent.").

¶ 100. There is no reason to think a second clarion call by this court re-announcing *Theriault*'s totality of the circumstances test will change court practices.

¶ 101. *Reason No. 3.* A per se rule should be adopted because juveniles do not have the decision-making capacity and understanding of adults. Emerging studies demonstrate that the area of the brain governing decision making and the weighing of risks and rewards continues to develop into the late teens and the early twenties.[46] Further studies show that

For a court of appeals case carefully analyzing all the facts and circumstances including the absence of a grandmother during interrogation and suppressing the confession of a 14–year-old, see *R.E.W. v. State,* No. 1986AP471, unpublished slip op. (Wis. Ct. App. Oct. 16, 1986) (14–year-old, Rock County).

For a Wisconsin Supreme Court case in which the court failed to consider *Theriault* at all in determining whether a juvenile's (aged 16 years, 9 months) waivers of right to counsel and right to remain silent were, under the totality of the circumstances, knowing, intelligent, and voluntary, see *State v. Woods,* 117 Wis. 2d 701, 345 N.W.2d 457 (1984). In that case, Woods' mother went to the police station and asked to see Woods. The police denied permission because he was being interrogated. The case was overruled by the Seventh Circuit Court of Appeals under a different name, *Woods v. Clusen,* 794 F.2d 293 (7th Cir. 1986).

Compare *State v. Bendlin,* No. 1998AP426, unpublished slip op. (Wis. Ct. App. Oct. 16, 1986), with *Woods.* In *Bendlin,* the court of appeals suppressed statements made by a 17–year-old as violative of *Miranda,* including a reference to *Theriault*'s language requiring "greatest care" in assessing the validity of a juvenile's confession.

[46] *See, e.g.,* Elizabeth R. Sowell et al., *Mapping Continued Brain Growth and Gray Matter Density Reduction in Dorsal*

children under the age of 16 are less capable than adults of understanding their *Miranda* rights,[47] have a propensity to confess to police,[48] and are less capable than adults of making long range decisions.[49] As the United States Supreme Court observed over 40 years ago, adult

*Frontal Cortex: Inverse Relationships during Postadolescent Brain Maturation,* 21 J. Neurosci. 8819, 8828 (2001).

Information about juvenile brain development is available on the ABA's Juvenile Justice Center's website at http://www.abanet.org/crimjust/juvjus/resources#brain.

[47] *See, e.g.,* Barbara Kaban & Ann E. Tobey, *When Police Question Children: Are Protections Adequate?,* 1 J. Ctr. for Child. & Cts. 151 (1999); Barry C. Field, *Competence, Culpability, and Punishment: Implications of Atkins for Executing and Sentencing Juveniles,* 32 Hofstra L. Rev. 463, 530–535 (Winter 2003); David T. Huang, *Less Unequal Footing: State Courts' Per Se Rules for Juvenile Waivers During Interrogations and the Case For Their Implementation,* 86 Corn. L. Rev. 437, 449 (2001); Robert E. McGuire, *A Proposal to Strengthen Juvenile Miranda Rights: Requiring Parental Presence in Custodial Interrogation,* 53 Vand. L. Rev. 1355, 1381–82 (2000); Thomas Grisso, *Juveniles' Capacities to Waive Miranda Rights: An Empirical Analysis,* 68 Cal. L. Rev. 1134, 1160–61 (1980).

[48] *See, e.g.,* Allison D. Redlich & Gail S. Goodman, *Taking Responsibility for an Act Not Committed: The Influence of Age and Suggestibility,* Law & Human Behavior 141, 152–53 (April 2003); Kaban & Tobey, *supra* note 47; Jennifer J. Walters, Comment, *Illinois' Weakened Attempt to Prevent False Confessions by Juveniles: The Requirement of Counsel for the Interrogations of Some Juveniles,* 33 Loy. U. Chi. L. J. 487, 504–05 (2002); McGuire, *supra* note 47, at 1381–82; Maggie Bruck & Stephen J. Ceci, *The Suggestibility of Children's Memory,* 50 Ann. Rev. Psychol. 419 (1999); Amy Bach, *True Crime, False Confession,* The Nation, Feb. 8, 1999, at 21.

[49] *See, e.g.,* Elizabeth S. Scott & Lawrence Steinberg, *Blaming Youth,* 81 Tex. L. Rev. 799, 814–15 (Feb. 2003). *See* Wis. Stat. § 48.375 (requiring parental consent for abortion, finding

advice would put a juvenile "on a less unequal footing with his [or her] interrogators."[50]

¶ 102.   Courts using the totality of circumstances test have not considered this evidence and have not weighed factors that make children uniquely vulnerable during interrogation.[51]

¶ 103.   *Reason No. 4.* A per se rule should be adopted to prevent false confessions. Although it is difficult for many of us to understand what leads an innocent person to confess to a crime, especially a serious felony, researchers have documented that false confessions are "a leading cause of the wrongful convictions of the innocent in America."[52]

¶ 104.   When used against vulnerable suspects, standard police interrogation techniques are especially apt to lead to false confessions.[53] Juveniles and the mentally retarded are the most vulnerable to modern psychological interrogation techniques.[54] It follows that juveniles "appear with some regularity in false confession cases."[55]

---

that "[i]mmature minors often lack the ability to make fully informed choices that take account of both immediate and long-range consequences").

[50] *Gallegos v. Colorado,* 370 U.S. 49, 54 (1962).

[51] *See* Reason No. 2 and cases discussed at note 45, *supra.*

[52] Steven A. Drizin & Richard A. Leo, *The Problem of False Confessions in the Post-DNA World,* 82 N.C. L. Rev. 891, 906 (2004).

[53] *See, e.g.,* Welsh S. White, *False Confessions and the Constitutional Safeguards Against Untrustworthy Confessions,* 32 Harv. C.R.-C.L. L. Rev. 105, 120 (1997).

[54] Drizin & Leo, *supra* note 52, at 919.

[55] John E. Reid and Associates, *False Confession Cases— The Issues,* available at http://www.reid.com/educational_info/ r_tips.html?serial=1080839438473936&print.

¶ 105. Although it is difficult to quantify the exact number of false juvenile confessions, the court of appeals referred to one study in which over a two-year period almost a dozen juveniles in the United States who confessed to committing murder were subsequently proven innocent.[56] The majority opinion acknowledges false confessions and notes the Central Park jogger rape case in which five youths ages 14 to 16 (interrogated in the absence of their parents) falsely confessed to rape.[57]

¶ 106. The U.S. Supreme Court has accepted that parental counsel and advice are crucial protections for juveniles against coercion and intimidation during police interrogation and are crucial to the voluntariness analysis. The Supreme Court has urged that the "greatest care must be taken to assure that the admission was voluntary,"[58] and that a juvenile needs someone to lean on "lest the overpowering presence of the law, as he knows it, may not crush him."[59]

¶ 107. At least two state courts have concluded that when a parent is deliberately excluded from interrogation of a juvenile, a confession almost invariably will be suppressed.[60]

---

[56] *Jerrell C.J.*, 269 Wis. 2d 442, ¶ 30, citing Walters, *supra* note 48, at 489.

[57] *See* majority op., ¶ 26 n.6. For discussions of the Central Park jogger case, see, *e.g.*, Sydney H. Schanberg, *When Justice is a Game: A Journey Through the Tangled Case of the Central Park Jogger*, Village Voice, Nov. 20–26, 2002, at 36; Rivka Gewirtz Little, *Changed Lives Among Central Park Five Family Members Across 110th Street*, Village Voice, Nov. 6–12, 2002, at 39; Dasun Alah, *Guilty Until Proven Innocent*, Village Voice, Sept. 11–17, 2002, at 24.

[58] *In re Gault*, 387 U.S. 1, 55 (1967).

[59] *Haley v. Ohio*, 332 U.S. 596, 600 (1948).

[60] *State v. Farrell*, 766 A.2d 1057, 1062 (N.H. 2001); *State v. Presha*, 748 A.2d 1108, 1118 (N.J. 2000).

¶ 108. Given the limited mental abilities of juveniles and their heightened susceptibility to suggestion, a per se rule is needed to increase the likelihood that a guilty verdict will not be based on a false confession and be overturned on appeal. A per se rule thus fosters the fair administration of justice.

¶ 109. *Reason No. 5.* A per se rule should be adopted to protect parental and family values. One of the oldest fundamental liberty interests recognized by the U.S. Supreme Court is that of parents to direct the care, control, and upbringing of their children.[61] This constitutional protection extends to parents' right to be consulted in decisions that have potentially traumatic and permanent consequences.[62]

¶ 110. This court's failure to mandate that a parent or interested adult be present during juvenile interrogation offends constitutionally protected—and societally accepted—concepts of parental rights.

¶ 111. *Reason No. 6.* A per se rule should be adopted because it comports with Wisconsin legislative policy evidenced in numerous statutes requiring parents or guardians to have a say in a variety of significant decisions affecting their children.[63]

---

[61] *See Troxel v. Granville,* 530 U.S. 57, 65 (2000); *Prince v. Massachusetts,* 321 U.S. 158, 166 (1944); *Pierce v. Society of the Sisters,* 268 U.S. 510, 534–35 (1925); *Meyer v. Nebraska,* 262 U.S. 390, 399 (1923).

[62] *H.L. v. Matheson,* 450 U.S. 398, 412 (1981).

[63] *See Jerrell C.J.,* 269 Wis. 2d 442, ¶ 29 (citing state laws requiring parental consent for marriage, buying or leasing a car, purchasing alcohol or tobacco products, changing one's name, and having an abortion).

¶ 112. This court's failure to mandate that a parent or interested adult be present during juvenile interrogation offends legislatively protected—and societally accepted—parental rights.

¶ 113. *Reason No. 7.* A per se rule should be adopted because it has proven to function well in other states and in England. According to one commentator, thirteen states have adopted, by case law or legislative action, some form of a per se parental consultation rule.[64] In 1998 the Kansas supreme court[65] reviewed court-imposed rules from Massachusetts,[66] Missouri,[67] New York,[68] Indiana,[69] Vermont,[70] and Florida[71] and adopted a per se rule.

¶ 114. Great Britain's Police and Criminal Evidence Act of 1984 details a Code of Practice for the Detention, Treatment, and Questioning of Persons by Police Officers, including those persons under 17 years of age. Juveniles must have an "appropriate adult"

---

[64] Thomas J. Von Wald, Note, *No Questions Asked! State v. Horse: A Proposition for a Per Se Rule When Interrogating Juveniles,* 48 S.D. L. Rev. 143, 164 n.237 (2002–03).

[65] *In re B.M.B.,* 955 P.2d 1302 (Kan. 1998). Counsel for B.M.B. argued that the following states have statutory restrictions on the admissibility of unadvised juvenile statements: Colorado, Connecticut, Iowa, Montana, North Carolina, Oklahoma, and West Virginia. *See id.* at 1310.

[66] *See Commonwealth v. MacNeill,* 502 N.E.2d 938 (Mass. 1987).

[67] *In re K.W.B.,* 500 S.W.2d 275 (Mo. App. 1973).

[68] *See In re Aaron D.,* 290 N.Y.S.2d 935 (1968).

[69] *Lewis v. State,* 288 N.E.2d 138 (Ind. 1972); *Sevion v. State,* 620 N.E. 2d 736, 737 n.1 (Ind. App. 1993).

[70] *See In re E.T.C.,* 449 A.2d 937 (Vt. 1982); *State v. Piper,* 468 A.2d 554 (Vt. 1983).

[71] *J.E.S. v. State,* 366 So. 2d 538 (Fla. App. 1979).

present during interrogation. An "appropriate adult" is defined as a parent or guardian, or, if the child is under a local authority, a representative of that authority. Once a child is taken into custody, authorities must inform this adult as soon as practicable. Police are required to inform the child that an adult is there to advise him or her, and that he or she has the right to consult with the adult privately at any time. During the interview, the police must advise the adult that the adult is not expected to function merely as an observer, but is present to advise the child, assure that the interview is properly and fairly conducted, and "facilitate communication" between the parties.

¶ 115. *Reason No. 8.* A per se rule should be adopted because such a rule is the right, just, and fair way to operate the Wisconsin judicial system.

¶ 116.  Police and law television dramas may lead us to believe that interrogations using psychological tactics (including trickery) lead to sound and reliable confessions.[72] Television is not reality. What may be compelling entertainment (as we cheer for the good guys and applaud the capture and successful prosecution of the bad guys) is far removed from the complications of the real world that sadly includes unreliable and false confessions.

¶ 117.  Wisconsin must do more than apply the "totality of the circumstances" rule to protect children and families and tackle the problem of false confessions. Mandating electronic recording of juvenile interroga-

---

[72] The court has held that trickery, that is, misrepresentations during an interrogation of a juvenile, is considered on a case-by-case basis as part of the totality of the circumstances to determine whether the misrepresentation created pressure sufficient to overcome a suspect's free will. *State v. Woods,* 117 Wis. 2d 701, 726, 345 N.W.2d 457 (1984).

tions is a very important step, but it is only one step. I would have the court fashion a rule requiring the participation of an interested adult in the interrogation process of juveniles. Other jurisdictions provide good working models. Such a rule will provide desperately needed procedural safeguards to protect children and families and to ensure the validity of confessions and the sound administration of justice.

¶ 118. For the reasons set forth, I join the majority opinion but also separately concur.

¶ 119. I am authorized to state that Justices ANN WALSH BRADLEY, N. PATRICK CROOKS, and LOUIS B. BUTLER, JR. join only Part I of this concurrence.

¶ 120. LOUIS B. BUTLER, JR., J. *(concurring)*. I join the decision and mandate of the court. While I share many of the concerns stated by Chief Justice Abrahamson in her concurring opinion, and join Part I of that opinion, I conclude that we should proceed with caution in light of the new rule we have adopted. By requiring electronic recording of custodial interrogations for juveniles in future cases where feasible, including without exception when questioning occurs at a place of detention, we may have already addressed the important concerns identified by the Chief Justice in Part II of her concurring opinion. In any case, we should certainly evaluate the effectiveness of electronic recording before deciding whether this court should create additional protections pursuant to our supervisory powers that are necessary to protect the rights of children. If the rule we create today eliminates conflicts in evidence attributable to flaws in human memory, reduces the number of disputes over the voluntariness of confessions, protects police officers wrongfully ac-

cused of improper tactics, enhances interrogations of juveniles, and protects the rights of the accused, then we need go no further. If problems persist, however, including the problem of false confessions by children, then I would agree with the Chief Justice that another look at a per se rule requiring the presence of an "interested adult" is warranted.

¶ 121. I nonetheless write separately because Jerrell's constitutional rights were violated in another manner. During the interrogation, Jerrell asked the police several times if he could call his parents. Each time his requests were denied. His requests constituted an invocation of his Fifth Amendment privilege against self-incrimination. Once he asked for his parents, all interrogation should have ceased until he was given an opportunity to consult with them.

¶ 122. In *Miranda v. Arizona*, 384 U.S. 436 (1966), the United States Supreme Court announced the procedures to be followed for the admissibility of statements obtained during a custodial interrogation. The requirement of warnings is not of import here. What is relevant is what happens when a suspect invokes his or her privilege:

> If an individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At that point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes the privilege cannot be other than the product of compulsion, subtle or otherwise. . . . If the individual states that he wants an attorney, the interrogation must cease until an attorney is present.

*Id.* at 473–74.

¶ 123. The rule in *Miranda* centered on the lawyer's special ability to help a client preserve his Fifth

Amendment rights once the client was caught in the adversary process and also on the lawyer's role as "the protector of the legal rights of that person in his dealings with the police and the courts." *Fare v. Michael C.*, 442 U.S. 707, 719 (1979). In *Michael C.*, the United States Supreme Court declined to extend *Miranda's* implications to cover requests of a 16–year-old juvenile to speak to a probation agent during custodial interrogation.[1] The Court premised its conclusion on the fact that a probation officer is an agent of the state that seeks to prosecute the alleged offender. *Id.* at 720. A request to speak to a probation officer, the Court stated, might well be consistent with a desire to speak with the police. *Id.* at 724.

¶ 124. The Court declined to create a separate waiver test for juveniles, stating "the totality-of-the-circumstances approach is adequate to determine whether there has been a waiver even where interrogation of juveniles is involved." *Id.* at 725. The totality-of-the-circumstances analysis, the Court wrote, "take[s] into account those special concerns that are present when young persons, often with limited experience and education and with immature judgment, are involved." *Id.* at 725. The Court ultimately concluded that "[w]here the age and experience of a juvenile indicate that his request for his probation officer *or his parents* is, in fact, an invocation of his right to remain silent, the totality approach will allow the court the necessary flexibility to take this into account in making a waiver determination." *Id.* (emphasis added).

---

[1] The Court noted that it had "not yet held that *Miranda* applies with full force to exclude evidence obtained in violation of its proscriptions from consideration in juvenile proceedings." *Fare v. Michael C.*, 442 U.S. 707, 717 n.4 (1979). The Court assumed, without deciding, that *Miranda* applied. *Id.*

¶ 125. Since *Michael C.,* the law regarding the privilege against self-incrimination has changed. Before *Miranda,* the principal issue in cases involving police interrogation was not whether a defendant had waived his or her privilege against self-incrimination, but whether his or her statement was voluntary. *Michigan v. Tucker,* 417 U.S. 433 (1974). In *Tucker,* the police failed to advise the defendant of all of the *Miranda* warnings. The Court indicated that the procedural safeguards created in *Miranda* were not themselves rights protected by the constitution, but were instead measures to insure that the privilege against compulsory self-incrimination was protected. *Id.* at 444. The Court concluded that the police conduct at issue in *Tucker* did not abridge the defendant's constitutional privilege against compulsory self-incrimination, but departed only from the prophylactic standards laid down in *Miranda* to safeguard the privilege. *Id.* at 445–46.

¶ 126. *Michael C.* was decided subsequent to both *Miranda* and *Tucker.* As such, the focus was not on waiver or an invocation of the privilege, but was instead based on the traditional voluntariness analysis. It was not until later that the Court clarified that *Miranda* announced a constitutional rule, and was not created under the Court's supervisory powers. *Dickerson v. United States,* 530 U.S. 428, 438 (2000). Over time, the Court has come to recognize two constitutional bases for the requirement that a confession be voluntary to be admitted into evidence: the Fifth Amendment right against self-incrimination and the Due Process Clause of the Fourteenth Amendment. *Id.* at 433–34. The decision in *Michael C.* came prior to the Court's pronouncement in *Dickerson* that *Miranda* was grounded upon the constitution, and must be viewed in that light.

205

¶ 127. The Court has consistently recognized that the coerciveness of the custodial setting is of heightened concern when a juvenile is under consideration. *See Haley v. Ohio,* 332 U.S. 596, 599 (1948); *see also Gallegos v. Colorado,* 370 U.S. 49, 54 (1962). Constitutional distinctions between minors and adults are recognized for at least three reasons: "the peculiar vulnerability of children; their inability to make critical decisions in an informed, mature manner; and the importance of the parental role in child rearing." *Bellotti v. Baird,* 443 U.S. 622, 634 (1979); *Hardaway v. Young,* 302 F.3d 757, 764 (7th Cir. 2002).

¶ 128. Just this term, in a decision striking down the death penalty for juvenile offenders, the Court once again recognized three general differences between juveniles under 18 and adults. *Roper v. Simmons,* 543 U.S. __, 125 S. Ct. 1183, 1195 (2005). First, the Court recognized a lack of maturity and an underdeveloped sense of responsibility among the young that often result in impetuous actions and decisions. *Id.* The recognition of the comparative immaturity and irresponsibility of juveniles has led to almost every state prohibiting those under 18 years of age from voting, serving on juries, or marrying without parental consent. *Id.* Second, the Court acknowledged that juveniles are more susceptible to influence and psychological damage. *Id.* Accordingly, juveniles have less control, or less experience with control, over their own environment. *Id.* They lack the freedom that adults have to extricate themselves from a criminogenic setting. *Id.* Finally, the Court recognized that the character of a juvenile is not as well formed as that of an adult. *Id.*

¶ 129. Our Chief Justice has cited many reasons why young people lack the decision-making capacity and understanding of adults. Abrahamson, C.J., concur-

ring, ¶ 101. When a child is confronted with a difficult situation, custodial interrogation or otherwise, that child is more likely to want "mommy" or "daddy" to help that child out of a jam. *Michael C.,* 442 U.S. at 730 (Marshall, J. dissenting). That request constitutes both an attempt to obtain advice and a general invocation of the right to remain silent. *Id.* at 729–30.

¶ 130. I agree with the majority that we must apply the totality-of-the-circumstances analysis in evaluating the voluntariness of a confession. Majority op., ¶¶ 20–21. I conclude that the majority properly applied that analysis to the facts of this case. I also conclude, however, that Jerrell invoked his privilege against self-incrimination under the Fifth Amendment when he asked the detective to call his parents during the interrogation. He clearly asked for help when he repeatedly asked for his parents, and at his age, those requests must be construed as requests to remain silent until he had an opportunity to speak with his parents. While a parent may not have the special ability of a lawyer to protect legal rights of a child, a parent is certainly the protector of that child in all other respects, and certainly could be counted upon to give proper advice to his or her child. In view of the recently recognized constitutional underpinnings of *Miranda,* a juvenile should be entitled to at least the same constitutional protections as an adult. When a juvenile asks for help, help should be provided. As such, his confession should be suppressed because it is involuntary, and because he invoked his privilege against self-incrimination under the Fifth Amendment when he asked for his parents, but was not given an opportunity to consult with them.

¶ 131. For the foregoing reasons, I respectfully concur.

¶ 132. DAVID T. PROSSER, J. (*concurring in part, dissenting in part*). I agree with the majority's conclusion that Jerrell C.J.'s confession was involuntary and that his delinquency adjudication must be reversed. Having made that determination, however, the majority should stop. Instead, it continues on to require that all custodial interrogations of juveniles in future cases be electronically recorded where feasible, and without exception when questioning occurs at a place of detention. The court should have recommended legislation instead of legislating from the bench.

¶ 133. By its action, the court is attempting to dictate the practices of law enforcement agencies under the guise of "superintending" state courts. This is not an appropriate role for the judiciary in our system of government. From the imposition of this new rule, I respectfully dissent.

I

¶ 134. This case raises fundamental questions about supreme court power. The power of this court was addressed in 1982 in an opinion by then-Justice Abrahamson. *State v. Holmes,* 106 Wis. 2d 31, 315 N.W.2d 703 (1982). The court stated:

> It is well established that this court has express, inherent, implied and incidental judicial power. Judicial power extends beyond the power to adjudicate a particular controversy and encompasses the power to regulate matters related to adjudication.
>
> . . . .
>
> [T]he constitution grants the supreme court power to adopt measures necessary for the due administration of justice in the state, including assuring litigants a fair

trial, and to protect the courts and the judicial system . . . . Such power, properly used, is essential to the maintenance of a strong and independent judiciary, a necessary component of our system of government.

*Holmes,* 106 Wis. 2d at 44.

¶ 135. In this case, the court relies on its "superintending authority" over all state courts to exclude most statements from juveniles when the custodial interrogations producing those statements are not electronically recorded. This "superintending authority" is an express power embodied in Article VII, Section 3 of the Wisconsin Constitution.

¶ 136. It is not completely clear how the court's "superintending authority" differs from the court's inherent power, for the two powers sometimes overlap. But it is rather breathtaking for the court to describe its "superintending authority" as "unlimited in extent" without putting that notion into historical context. *See* majority op., ¶ 40. Even the State's police power is not "unlimited in extent."

¶ 137. Article VII, Section 3 of the 1848 constitution read as follows:

> The supreme court, except in cases otherwise provided in this constitution, shall have appellate jurisdiction only, which shall be coextensive with the state; but in no case removed to the supreme court shall a trial by jury be allowed. *The supreme court shall have a general superintending control over all inferior courts;* it shall have power to issue writs of habeas corpus, mandamus, injunction, quo warranto, certiorari, and other original and remedial writs, and to hear and determine the same.

Wis. Const. art. VII, § 3 (1848) (emphasis added). This section remained intact until 1977 when it was

amended to read, in part: "(1) The supreme court shall have superintending and administrative authority over all courts."

¶ 138. The 1977 amendment changed the term "superintending control" to superintending "authority" and added the phrase "administrative authority." I am not persuaded that changing "superintending control" to "superintending . . . authority" was intended to alter the nature or extent of this specific grant of power. If this view is correct, then an understanding of the original grant would be helpful in interpreting the present constitution. If this view is not correct, there ought to be clear evidence that the framers of the 1977 amendment intended a substantially enlarged grant of superintending power. I have found nothing in the legislative history to support the latter proposition.

¶ 139. The original version of Article VII, Section 3 appeared to tie the court's "superintending control" over inferior courts to the issuance of various writs, as the two provisions were included in the same sentence, divided by a semicolon. Nonetheless, the supreme court tried to sever the tie in *The Attorney General v. Blossom,* 1 Wis. 277 [*317] (1853). The court construed the "superintending" power very broadly, saying: "This sentence contains a clear grant of power. . . . It is unlimited in extent. It is undefined in character. It is unsupplied with means and instrumentalities. The constitution leaves us wholly in the dark as to the means of exercising this clear, unequivocal grant of power." *Blossom,* 1 Wis. at 283 [*325].

¶ 140. The court asked rhetorically whether the superintending power was to be exercised by means of the writs of habeas corpus, mandamus, quo warranto, injunction, and certiorari, and answered its question, in essence: "Not exclusively."

210

What, then, are the means, instrumentalities and agencies by which this power is to be exercised? Clearly the ordinary means provided by the common law, or such as should be supplied by legislative enactment. The very force of the terms, supreme court; comprehending, naming, instituting the highest, the *dernier* judicial tribunal known to, and recognized by the common law, necessarily carries with it all the writs, instrumentalities, powers and agencies provided by the common law for the convenient and complete exercise of such superintending control. It is idle to say that the enumeration of such writs as are mentioned, were made to supply such means of superintending control.

*Id.* at 284 [*325–26].

¶ 141.   In evaluating the court's analysis, it must be remembered that the question in *Blossom* was whether the supreme court had *original jurisdiction* to issue, hear, and determine prerogative writs. To answer this question, the court had to interpret the language of Article VII, Section 3. Building up the court's "superintending control" so that it was not limited to the issuance of prerogative writs was helpful, if not essential, to its ultimate conclusion that the court had original jurisdiction.

¶ 142.   In subsequent discussions, however, the court was more circumspect about this power. It concluded: "The power of superintending control is the power to 'control the course of ordinary litigation in inferior courts,' as exercised at common law by the court of King's Bench, and by the use of writs specifically mentioned in the constitution and other writs there referred to or authorized." *Seiler v. State,* 112 Wis. 293, 299, 87 N.W. 1072 (1901).

¶ 143.   *Seiler* followed closely the more frequently cited case of *State ex rel. Fourth National Bank of Philadelphia v. Johnson,* 103 Wis. 592, 79 N.W. 1081

211

(1899), in which the *Blossom* statement that the "superintending control" power is unlimited in extent, was quoted. But *Johnson* put that quote in perspective. It provided an extensive discussion of the King's Bench:

> [B]y the constitutional grant of "a general superintending control over all inferior courts" [the Wisconsin Supreme] court was endowed with a separate and independent jurisdiction, which enables and requires it in a proper case to control the course of ordinary litigation in such inferior courts, and was also endowed with all the common-law writs applicable to that jurisdiction. . . . That the makers of the constitution used the words in question understandingly, and with a specific meaning, and not as a mere rhetorical flourish or high sounding form of words, can admit of no doubt. Only a superficial knowledge of the growth and development of the English judicial system is necessary to determine what that meaning was and is. The English court of king's bench had a superintending jurisdiction over all the inferior courts of the realm, which it freely exercised by the use of well-defined writs from very early times.

*Johnson,* 103 Wis. at 613.

¶ 144. Writing for a unanimous court, Justice John B. Winslow quoted Blackstone as writing that the jurisdiction of the King's Bench "is very high and transcendent. It keeps all inferior jurisdictions within the bounds of their authority, and may either remove the proceedings to be determined here, or prohibit their progress below." *Id.* at 614. Blackstone explained that the King's Bench "commands magistrates and others to do what their duty requires, in every case where there is no other specific remedy." *Id.*[1]

---

[1] In her answer to Justice Roggensack's concurrence/dissent and this concurrence/dissent, Chief Justice Abrahamson

¶ 145. Justice John Wickhem summarized and synthesized 90 years of Wisconsin case law on the court's "superintending power" in a 1941 law review article. John D. Wickhem, *The Power of Superintending Control of the Wisconsin Supreme Court,* 1941 Wis. L. Rev. 153. He wrote:

> The purpose of this ["superintending control over inferior courts"] jurisdiction is to protect the legal rights of a litigant when the ordinary processes of action, appeal and review are inadequate to meet the situation, and where there is need for such intervention to avoid grave hardship or complete denial of these rights. Thus, it is held that before the court will

points to writings in *State ex rel. Umbreit v. Helms,* 136 Wis. 432, 118 N.W. 158 (1908), as a vindication of *The Attorney General v. Blossom,* 1 Wis. 277 [*317] (1853), and a repudiation of *State ex rel. Fourth National Bank of Philadelphia v. Johnson,* 103 Wis. 591, 79 N.W. 1081 (1899), and *Seiler v. State,* 112 Wis. 293, 87 N.W. 1072 (1901). The issue in *Helms* was very narrow: whether the Supreme Court had the authority under its constitutional "general superintending control over all inferior courts" to issue a writ of mandamus ordering a circuit court to reinstate a criminal complaint that the circuit court had dismissed. The court determined that it had this specific power under the constitution but it unanimously declined to use it, saying there was no justification under the facts of the case. Chief Justice Winslow, writing separately, bowed to the views of most of his colleagues that the court had the power to "review" a lower court's judicial error under circumstances where the Court of King's Bench would not have done so. 136 Wis. at 464 (Winslow, C.J., concurring). The court's well-mannered discussion of its "superintending control" power to issue a writ to a circuit judge in a specific fact situation is simply light years away from the concept that "The court's superintending power is as broad as necessary to meet the needs of changing circumstances." *See* Chief Justice Abrahamson's concurrence, ¶ 11.

intervene, it must appear that there is no adequate remedy by appeal or writ of error. For example, the order of the inferior court or its inaction, if that is the thing objected to, may be of such character as not to be appealable, or appeal from the judgment may come too late for effective redress. It is variously stated in the cases that to warrant exercise of the power there must be a clear legal right on the part of the applicant; a plain duty on the part of the inferior court; the remedy by appeal or writ of error must be inadequate; there must be an exigency calling for prompt action; the power is not to be used to perform the office of appeal or writ of error and the result of a refusal to act and to exercise superintending control must result in grave hardship to the litigant.

. . . .

These statements represent attempts to state in whole or in part the policy which underlies both the constitutional grant of supervisory control and the court's exercise of it as a matter of policy.

*Id.* at 161–62 (citations omitted).

¶ 146.    This description of superintending authority, to control the course of ordinary litigation in lower courts so as to avoid grave hardship to a litigant, is very different from the incredibly elastic power the court now employs. Somehow the court's superintending authority over all courts has been transformed into broad authority to mandate desirable policy ostensibly related to judicial proceedings but extending far beyond the litigants in a specific case. The power is being employed during normal appellate review, so that there is no intervention into a lower court proceeding because of an exigency. The court is not protecting a clear legal right; rather, it is creating new procedures that are not even deemed "rights." It is not acting because alternate

214

remedies are inadequate. It requires no grave hardship because Jerrell C.J.'s adjudication of delinquency has been reversed. In other words, the court's use of its superintending authority to effect an arguably desirable policy violates every principle of our express but limited constitutional power.

¶ 147. The court started down this road in 1967 when it sought to uphold the promulgation of an ethical code for judges. *See In re Promulgation of a Code of Judicial Ethics,* 36 Wis. 2d 252, 153 N.W.2d 873, 155 N.W.2d 565 (1967). The court said:

> At least twenty-three states have adopted a Code of Judicial Ethics by supreme court action, generally in the exercise of their recognized inherent and implied power of supervision over the courts, judges, and attorneys of the judicial system. The power has been considered generally to be as broad as is necessary for the administration of justice or as needed to protect the public or the state or a particular litigant. *Our constitution has expressly given this court superintending power over inferior courts.*
>
> . . . .
>
> We hold this court has an inherent and an implied power as the supreme court, in the interest of the administration of justice, to formulate and establish the Code of Judicial Ethics . . . . This power, inherent in the supremacy of the court and *implied from its expressed constitutional grants of supervisory power,* embraces all members of the judiciary.

*Id.* at 253–54 (emphasis added).

¶ 148. When County Judge Charles E. Kading of Jefferson County challenged a rule under the Code requiring disclosure of investment assets held by himself or his wife, the court upheld the Code rule on a 4–3

215

vote, saying: "We reject this attack on the fundamental authority of this court. Both the adoption of the code and the later adoption of Rule 17 are actions of this court performed under its inherent power to function as the supreme court *and also performed in carrying out the function of superintending control as expressly set forth in art. VII, sec. 3, of the Wisconsin Constitution.*" *In re Honorable Charles E. Kading,* 70 Wis. 2d 508, 516–17, 235 N.W.2d 409 (1975) (emphasis added).

¶ 149.  Speaking through Chief Justice Horace Wilkie, the court declared:

> [W]e find an additional source of authority for this court's promulgation of the Judicial Code . . . in the power which is reasonably implied from this court's express constitutional authority to exercise "a general superintending control over all inferior courts." This power of superintending control is "unlimited in extent . . . undefined in character . . . [and] unsupplied with means and instrumentalities." . . . Mr. Justice ROUJET MARSHALL, after a painstaking survey of this power[,] concluded in 1908 that it is "not limited other than by the necessities of justice" and that it necessarily includes "all . . . means applicable thereto and all power necessary to make such . . . means fully adaptable for the purpose." The superintending power is as broad and as flexible as necessary to insure the due administration of justice in the courts of this state.
>
> . . . .
>
> If this [superintending] power were strictly limited to the situations in which it was previously applied, it would cease to be superintending, since this word definitely contemplates ongoing, continuing supervision in response to changing needs and circumstances. The power of superintending control should not be ossified by an unduly restrictive interpretation of its extent.

*Id.* at 519–20 (citing *State ex rel. Umbreit v. Helms,* 136 Wis. 432, 462, 118 N.W. 158 (1908) (Marshall, J., concurring)).[2]

¶ 150. These paragraphs, supported by four members of a deeply divided court, in a case in which the court's inherent power to promulgate a code of judicial ethics would surely have sufficed, are the source of the court's contemporary "supervisory power." They are highly suspect. A writer in the Wisconsin Law Review noted immediately that, "These statements represented a considerable departure from prior interpretations of the court's constitutional authority to superintend inferior courts." Dennis Gallagher, *Superintending Power of the Wisconsin Supreme Court and Financial Disclosure Rules for Judges,* 1977 Wis. L.Rev. 1111, 1119 (1977). Calling the court's action "an unprecedented development," *id.* at 1121, the writer contended that:

> Justice Roujet Marshall's opinion in *Seiler v. State* shows clearly that the constitutional grant of "general superintending control" was understood as a very limited authority over actions in the inferior courts. In rejecting the argument that the superintending control clause could be used as authority to sustain acts of legislation purporting to grant the supreme court origi-

---

[2] The majority in *In re Honorable Charles E. Kading,* 70 Wis. 2d 508, 235 N.W.2d 409 (1975), overstated the breadth of Justice Marshall's characterization of the superintending power. Justice Marshall discussed the superintending power in light of the court's authority "to control litigation" and believed that, as of 1908, the court had left "nothing to be said to further define the superintending power." *State ex rel. Umbreit v. Helms,* 136 Wis. 432, 447, 458, 118 N.W. 158 (1908) (Marshall, J., concurring). The *Kading* court's holding required it to act contrary to Justice Marshall's advice by "further defin[ing]" the superintending power in a matter unrelated to "control[ling] litigation."

nal jurisdiction in certain criminal cases, Justice Marshall stated that superintending control should be understood as "the power to 'control the course of ordinary litigation in inferior courts,' as exercised at common law by the court of King's Bench, and by the use of writs specifically mentioned in the constitution . . . ." Justice Marshall rejected any extension of this power beyond its common law signification, such as using it to justify advisory opinions by the supreme court.

*Id.* at 1120 (citations omitted).

¶ 151.   In a hard-hitting dissent, Justice Robert Hansen also quoted Roujet Marshall:

"While the true limits of judicial power must be jealously guarded and firmly maintained, it would be as dangerous to extend as to limit the same, by giving to the language in which the jurisdiction was granted a meaning different from that which was in mind when the grant was made. The power of superintending control, as has been decided and before indicated, has to do only with controlling inferior courts in the exercise of their jurisdiction by the use of instruments mentioned specifically in the constitution or authorized thereby."

*Kading,* 70 Wis. 2d at 540 (Hansen, J., dissenting) (quoting *Seiler,* 112 Wis. at 300 n.9).

¶ 152.   As noted, Article VII, Section 3 of the constitution was amended in 1977 to produce new text: "The supreme court shall have superintending and administrative authority over all courts." Constitutional revision gave the supreme court *administrative authority* over all courts and simultaneously provided in Article VII, Section 4(3): "The chief justice of the supreme court shall be the administrative head of the judicial system and shall exercise this *administrative*

*authority* pursuant to procedures adopted by the supreme court." Wis. Const. art. VII, § 4(3) (emphasis added).

¶ 153.   This "administrative authority" creates an indisputable hierarchy among state courts, giving authority to the supreme court to establish policies and procedures for the state's entire judicial system. I see no evidence, however, that the 1977 amendments were intended to alter and enhance the "superintending . . . authority" of the supreme court. The use of the superintending authority to dictate law enforcement procedure is simply miles from the sort of superintending control over lower courts in specific cases that the framers intended.

## II

¶ 154.   The supreme "court has express, inherent, implied and incidental judicial power." *Holmes,* 106 Wis. 2d at 44. The court's inherent power has long been recognized. *See In re Janitor,* 35 Wis. 410 (1874); *Stevenson v. Milwaukee County,* 140 Wis. 14, 121 N.W. 654 (1909); *State v. Cannon,* 196 Wis. 534, 221 N.W. 603 (1928); *In re Cannon,* 206 Wis. 374, 240 N.W. 441 (1932); *Integration of the Bar,* 273 Wis. 281, 77 N.W.2d 602 (1956); Lynn Laufenberg & Geoffrey Van Remmen, *Inherent Power and Administrative Court Reform,* 58 Marq. L. Rev. 133 (1975); Gallagher, *supra.* It is not my purpose to try to define the scope of inherent power, except to agree that the court's "power must necessarily be expansive enough to facilitate the performance of constitutional mandates." Laufenberg & Van Remmen, *supra,* at 157.

¶ 155.   It should be obvious, however, that neither the court's inherent power nor its "administrative authority over all courts" can reasonably be employed in

the circumstances of this case, and that is why the court has relied upon an amorphous "supervisory" power. Majority op., ¶¶ 3, 58. If the majority opinion represents a proper use of the court's "superintending ... authority," then, logically, there is no practical reason why the court could not dictate any aspect of police investigative procedure that is designed to secure evidence for use at trial. The people of Wisconsin have never bestowed this kind of power on the Wisconsin Supreme Court.

## III

¶ 156. The majority outlines the advantages it sees in adopting a rule that custodial interrogation of a juvenile must be electronically recorded if the state seeks to use any statement by the juvenile in court. Majority op., ¶¶ 51–57. In doing so, it cites an American Bar Association resolution urging that such a rule apply to *all* custodial interrogations of crime suspects. This formulation obviously includes adults. *Id.,* ¶ 56. As Bob Dylan would put it, "You don't need a weather man to know which way the wind blows."[3]

¶ 157. The court's new rule is not required by any constitutional provision and is not "absolutely essential" to the administration of justice. *See Kading,* 70 Wis. 2d at 518. Promises that "This court will not use its superintending power where there is another adequate remedy," *Arneson v. Jezwinski,* 206 Wis. 2d 217, 226, ¶ 4, 556 N.W.2d 721 (1996), have been replaced with frank rejection of "the State's leave-it-to-the-legislature approach." Chief Justice Abrahamson's concurrence, ¶ 4.

---

[3] Bob Dylan, *Subterranean Homesick Blues, on Bringing It All Back Home* (Columbia Records 1965).

¶ 158. The new rule undeniably leaves many questions unanswered. What is "custodial interrogation" under the rule? Are the exceptions to what is "custodial" and what is "interrogation" under *Miranda v. Arizona,* 384 U.S. 436 (1966), still valid? How does the rule apply to a student's interview in a school principal's office? In an era of tiny portable recorders, when is electronic recording not "feasible"? Must the subject of interrogation be notified that his words will be recorded? May a subject waive recording? Does the "fruit of the poisonous tree" doctrine apply to unrecorded statements?

¶ 159. I share the majority's conclusion that electronic recording of juvenile confessions is a worthwhile policy goal. However, developing the details of a rule is demanding work. The legislature might not answer all the questions better than this court, but in drafting legislation, it would at least have to try. At a minimum, the court should delay the implementation of its new rule to give law enforcement agencies time to prepare for it. In addition, I urge the legislature to promptly address the issue of electronic recording of statements by juveniles and adults, so that law enforcement will have clear guidelines to follow.

¶ 160. PATIENCE DRAKE ROGGENSACK, J. *(concurring in part and dissenting in part).*—I concur in the majority opinion's conclusion that Jerrell C.J.'s confession was not voluntary, and therefore his delinquency conviction must be reversed. Majority op., ¶ 59. I also agree that requiring law enforcement to tape record its questioning of juveniles wherever possible and on all occasions when a juvenile is questioned at a place of detention would benefit both juveniles and law enforcement. However, I cannot join in the court's

mandate that unless interviews with juveniles are tape recorded, statements made in those interviews will be suppressed at trial. Majority op., ¶ 47.

¶ 161.  The majority claims that Article VII, Section 3 of the Wisconsin Constitution gives the supreme court the power to suppress statements taken in contravention of its directive. Majority op., ¶ 49. In my view, the court's superintending authority under Article VII, Section 3 does not permit the court to interfere in the practices of law enforcement unless those practices violate either a constitutional right or a law established by the legislature. Failing to record interrogations of juveniles does neither. Accordingly, I respectfully dissent from that portion of the majority opinion.

¶ 162.  This court has never before concluded that it had the power to suppress defendants' statements in certain situations merely because it preferred a different law enforcement technique in the procurement of those statements, as it concludes today. To the contrary, suppression of a defendant's statement has been required only when the law enforcement conduct at issue threatened an imminent loss of defendants' constitutional rights or was illegal.[1] Accordingly, the step taken

---

[1] For example, it has long been held that in order to be admitted at trial, a defendant's confession must be voluntary. *State v. Hunt*, 53 Wis. 2d 734, 740, 193 N.W.2d 858 (1972); *Lynumn v. Illinois*, 372 U.S. 528, 534 (1963). The rule requiring suppression of involuntary confessions is grounded in a defendant's due process right to a fair trial, *Michigan v. Tucker*, 417 U.S. 433, 441 (1974), and linked to the Fifth Amendment's right against self-incrimination, *Miranda v. Arizona*, 384 U.S. 436, 461 (1966), as well as the mirror of the Fifth Amendment in Article I, Section 8 of the Wisconsin Constitution, *State v. Hanson*, 136 Wis. 2d 195, 211, 401 N.W.2d 771 (1987). Suppression is also bottomed in the concept that law enforcement

by the majority opinion is a huge expansion of the court's Article VII, Section 3 powers.

¶ 163.  As a preamble to the exercise of what it describes as the court's supervisory powers granted in Article VII, Section 3 of the Wisconsin Constitution, the majority opinion declares:

> Article VII, Section 3 of the Wisconsin Constitution expressly confers upon this court superintending and administrative authority over all state courts. This provision "is a grant of power. It is unlimited in extent. It is indefinite in character." (citing *State v. Jennings,* 2002 WI 44, ¶ 13, 252 Wis. 2d 228, 647 N.W.2d 142 (quoting *State ex rel. Fourth Nat'l Bank of Philadelphia v. Johnson,* 103 Wis. 591, 611, 79 N.W. 1081 (1899)).

Majority op., ¶ 40. While the words used in the quote from *Johnson* are accurately repeated, they are taken out of context, and in so doing, the majority opinion gives them a meaning that is completely different from that expressed in *Johnson.*[2]

---

personnel must obey the law, even as they enforce it. *Arizona v. Fulminante,* 499 U.S. 279, 293 (1991).

In *Miranda,* the United States Supreme Court instituted measures designed "to permit a full opportunity [for those in custody] to exercise the privilege against self-incrimination." *Miranda,* 384 U.S. at 467. The Court deemed the *Miranda* protocols necessary for "any assurance of real understanding and intelligent exercise of the privilege [against self-incrimination]." *Id.* at 469. In the present case, the majority does not claim the recording requirement is *necessary* to protect suspects' constitutional rights, but rather mandates recording because it deems the procedure beneficial.

[2] *State v. Jennings,* 2002 WI 44, 252 Wis. 2d 228, 647 N.W.2d 142, repeats the same language from *State ex rel. Fourth National Bank of Philadelphia v. Johnson,* 103 Wis. 591, 79 N.W. 1081 (1899), but *Jennings* declined to use it to stretch the

¶ 164. Article VII, Section 3 currently has three sentences that pertain to the supreme court's jurisdiction: (1) superintending and administrative authority over all courts; (2) original jurisdiction; and (3) appellate jurisdiction.[3] When the decision in *Johnson* was made, Article VII, Section 3 was expressed in three clauses. Because the court of appeals had not yet been created, Section 3 was worded differently in regard to the court's appellate jurisdiction as well. However, the court had been granted superintending authority over all "inferior courts," and it was that power the *Johnson* decision examined.[4]

¶ 165. The question presented in *Johnson* was whether the exercise of the court's superintending power was limited to the court's use of the specific writs listed in Section 3. *Johnson,* 103 Wis. at 610–11. The court concluded that the superintending power was an independent grant of constitutional power from that

court's supervisory power to require the court of appeals to certify cases in which the court of appeals is faced with a direct conflict between a decision of the United States Supreme Court and a decision of this court on a question of federal law. *Jennings,* 252 Wis. 2d 228, ¶¶ 13–16.

[3] Article VII, Section 3 of the Wisconsin Constitution states:

(1) The supreme court shall have superintending and administrative authority over all courts.

(2) The supreme court has appellate jurisdiction over all courts and may hear original actions and proceedings. The supreme court may issue all writs necessary in aid of its jurisdiction.

(3) The supreme court may review judgments and orders of the court of appeals, may remove cases from the court of appeals and may accept cases on certification by the court of appeals.

[4] In 1899 when *Johnson* was decided, Article VII, Section 3 provided: "the supreme court shall have a general superintending control over all inferior courts." *Id.* at 611.

listed in the writs clause of Section 3, and that the exercise of the superintending power was not dependent on the use of a writ. *Id.* at 610–12.

¶ 166. In so concluding, the court repeated the words used in the superintending clause of Article VII, Section 3 and explained that the wording of that clause was "unlimited in extent," meaning that the grant of power did not have to be exercised through the use of a writ listed in the following clause of Section 3. The court's statement that the wording of the clause was "indefinite in character" confirmed that the court could exercise its power in ways other than that accorded in a listed writ. The court in *Johnson* was not concluding that the power granted in the superintending clause of Section 3 was unlimited in extent or indefinite in character, only that *the means* by which that power could be exercised was not limited by the writs clause of Section 3. *Id.* After its explanation of the lack of a limitation on the means by which superintending control could be exercised, the court described, in lengthy detail, that the superintending power of the court was the power to control the course of ordinary litigation in all other courts. *Id.* at 612. The court explained that Section 3 mirrored the power of a court known as King's Bench under English common law when the Wisconsin Constitution was created. *Id.* at 612–14. Because the King's Bench had power broader than the writs clause of Article VII, Section 3, the court concluded that the Wisconsin Supreme Court had that power as well. *Id.* at 614–16.

¶ 167. The majority contends that the requirement that a juvenile's statements to law enforcement cannot be used at trial unless the questioning was accomplished with the required tape recording is simply a rule of evidence. Majority op., ¶ 48. However, in order

225

for the supreme court to create an evidentiary rule, it must give notice and have a hearing. *See* Wis. S. Ct. IOP III-A (September 16, 1996). There was no notice or hearing that the court was considering a new rule of evidence.[5] Additionally, the mandate is intended to affect law enforcement practices. Majority op., ¶¶ 46–47. The legislature has the power to regulate how law enforcement conducts its official duties. *See, e.g., State ex rel. Young v. Shaw,* 165 Wis. 2d 276, 287–88, 477 N.W.2d 340 (Ct. App. 1991). Absent the necessity to protect against an imminent infringement of defendants' constitutional rights or a violation of the constitution or a statute, the supreme court does not have the authority to regulate how law enforcement, a part of the executive branch of government, accomplishes its official duties.

¶ 168.   Furthermore, this case is not the first time that we have been asked to interpret our superintending authority to regulate proceedings in another branch of government. In *State ex rel. Thompson v. Nash,* 27 Wis. 2d 183, 133 N.W.2d 769 (1965), we were asked to interpret the constitution to permit the circuit court, which had superintending powers under then Article VII, Section 8 of the Wisconsin Constitution, to proscribe procedures used in an administrative proceeding. *Id.* at 193. We declined to do so, concluding that we have never interpreted superintending powers as sufficient "to interfere with the orderly operating procedures of an administrative agency in the absence of a showing of a denial of due process." *Id.* at 194.[6]

---

[5] In my view, as explained herein, the court does not have the power to cause the same requirement by rule, even if its rule-making procedures were followed.

[6] In *Guthrie v. Wisconsin Employment Relations Commission,* 111 Wis. 2d 447, 331 N.W.2d 331 (1983), we did establish a

¶ 169. While we adopted recording as one of the criteria to consider before admitting hypnotically affected testimony in *State v. Armstrong,* 110 Wis. 2d 555, 571 n.23, 329 N.W.2d 386 (1983), the majority takes this approach further here by not merely outlining guidelines for the admissibility of a certain type of evidence, but instead instituting a per se ban on such evidence. It prohibits circuit courts from admitting such evidence under circumstances where the reliability and voluntary nature of the testimony could not be challenged and its only "flaw" is that it was not recorded.

¶ 170. Likewise, interrogations of juveniles differ from the polygraph evidence at issue in *State v. Dean,* 103 Wis. 2d 228, 307 N.W.2d 628 (1981), where we concluded that "the lack of [an adequate standard for circuit courts to gauge the reliability of polygraph evidence] heightens our concern that the burden on the trial court to assess the reliability of stipulated polygraph evidence may outweigh any probative value the evidence may have." *Id.* at 279. Here, courts have longstanding standards by which to assess whether an in-custody admission was knowing and voluntary. The majority does not contend that unrecorded admissions are per se unreliable, but instead chooses to institute a blanket prohibition on unrecorded admissions simply because it prefers this alternative.

per se rule that a judge in administrative proceedings must disqualify himself or herself, if the judge had acted as counsel for one of the parties in the same action or proceeding. *Id.* at 458. However, we did so because a fundamental tenet of due process is a decision maker who is, and appears to be, impartial. *Id.* at 457–58.

¶ 171.  The majority opinion concentrates both the legislative and the judicial power in the supreme court.[7] By its mandate, the court has enacted a law (custodial questioning of juveniles must be tape recorded where feasible and without exception if the questioning occurs at a place of detention); the court will interpret its law (if a question arises about whether tape recording is required by the circumstances of the case); and the court will mete out the punishment for a violation (exclusion of all statements made if not recorded under the circumstances set out in the majority opinion).

¶ 172.  Concentration of power in one branch of government in a tripartite system of government is suspect because the system was created to prevent exactly that. *See State v. Holmes,* 106 Wis. 2d 31, 42, 315 N.W.2d 703 (1982). Concentration permits one branch of government to exercise power with no procedural check or balance by another branch. As we, ourselves, have repeatedly explained, the Wisconsin Constitution envisions a separation of the legislative and judicial powers. *Id.* Here, a majority of the court says it has the requisite constitutional power. Query:  If the court bases its decision on the constitution, who is to say the court has gone too far when the supreme court is the final arbiter of what the constitution means?

¶ 173.  The concurrence of the Chief Justice discusses at great length a view of the extent of this court's

---

[7] This is not the first time this term that the court has done so. In March, as a result of a rule-making petition, the court "repealed" the frivolous action statute, Wis. Stat. § 814.025, a substantive rule enacted by the legislature, which was not unconstitutional. Supreme Court Order No. 03–06, effective July 1, 2005, 2005 WI 38, ___ Wis. 2d ___.

supervisory authority under Article VII, Section 3 of the Wisconsin Constitution. In none of the cases cited has the Wisconsin Supreme Court even tangentially implied that the supreme court has the authority to direct how law enforcement carries out its official duties. Yet, that is the issue that the majority opinion takes up here: Can this court suppress the admission of statements obtained by law enforcement, through means that are neither unconstitutional nor contrary to statute, by virtue of the supervisory authority contained in Article VII, Section 3?

¶ 174. The concurrence also asserts that the "exercise [of the court's] superintending power here is a question of policy, not power." Chief Justice Abrahamson's concurrence, ¶ 65. This view assumes that the supreme court does have the power to regulate police conduct that is neither unconstitutional nor violative of a statute. This assertion is taken from the writings of Justice Bablitch in *State ex rel. Hass v. Wisconsin Court of Appeals,* 2001 WI 128, 248 Wis. 2d 634, 636 N.W.2d 707, where he explains that in that case, "The question of whether the court will exercise its superintending authority is one of policy, not power." *Id.,* ¶ 12. However, in *Hass* there was no doubt that the supreme court did have the power to direct the court of appeals to grant all petitions for interlocutory appeal where the circuit court had denied the defense that the action was barred due to a final federal court judgment. *Id.,* ¶ 10. The issue presented in *Hass* was whether the court *should* do so. *Id.* Here, the issue is whether the court does, indeed, have the power it has exercised.

¶ 175. I disagree with the assertion that the early interpretations of Article VII, Section 3 were "broad." Chief Justice Abrahamson's concurrence, ¶ 77. To the contrary, our earliest cases after the adoption of the

229

Wisconsin Constitution explained that the supreme court's Article VII, Section 3 supervisory power related only to the supreme court's regulation of other state courts. In *Attorney General v. Blossom,* 1 Wis. 317 (1853), we sought to explain how these powers could be exercised: "What, then, are the means, instrumentalities and agencies by which this power is to be exercised? Clearly the ordinary means provided by the common law, or such as should be supplied by legislative enactment." *Id.* at 325–26. And in *Seiler v. State,* 112 Wis. 293, 87 N.W. 1072 (1901) we said: "The power of superintending control is the power to 'control the course of ordinary litigation in inferior courts,' as exercised at common law by the court of King's Bench, and by the use of writs specifically mentioned in the constitution and other writs there referred to or authorized." *Id.* at 299. The court in *Seiler* then went on to explain how the constitutional terms were chosen and their meaning at the time the constitution was adopted:

> The term "superintending control" then had a well-defined meaning, and it, and none other, was carried into the constitution by the framers thereof. In order to correctly understand that meaning, we must view the constitution from the standpoint of its framers. If we were not anchored firmly to the common-law idea of the extent of mere superintending control of one court over another, as distinguished from appellate jurisdiction, we should drift at once into confusion in respect to the scope of the authority of this court. While the true limits of judicial power must be jealously guarded and firmly maintained, it would be as dangerous to extend as to limit the same, by giving to the language in which the jurisdiction was granted a meaning different from that which was in mind when the grant was made. The power of superintending control, as has been decided and before indicated, has to do only with controlling inferior courts in the exercise of their jurisdiction . . . .

*Id.* at 300. Certainly any reader will see the leap from supervising lower courts to supervising law enforcement.[8]

---

[8] The following cases are listed in the order in which they are mentioned in the Chief Justice's concurrence. Several have nothing to do with Article VII, Section 3 and several examine only whether the court has original jurisdiction in given circumstances: *State ex rel. Friedrich v. Circuit Court for Dane County,* 192 Wis. 2d 1, 531 N.W.2d 32 (1995) (addressing whether the rates set for court-appointed attorneys must be those set by the supreme court or those set by statute; *Friedrich* never mentions Article VII, Section 3); *Arneson v. Jezwinski,* 206 Wis. 2d 217, 556 N.W.2d 721 (1996) (concluding that the supreme court should use its Article VII, Section 3 power to require the court of appeals to grant all petitions for interlocutory appeal where a claim of qualified immunity had been denied in the circuit court); *State ex rel. Hass v. Wis. Court of Appeals,* 2001 WI 128, 248 Wis. 2d 634, 636 N.W.2d 707 (concluding that the supreme court should not use its Article VII, Section 3 power to require the court of appeals to grant all petitions for interlocutory appeal where the circuit court has denied a defense that the action before the court is barred by a final federal adjudication); *State v. Jennings,* 2002 WI 44, 252 Wis. 2d 228, 647 N.W.2d 142 (concluding that the supreme court should not use its Article VII, Section 3 power to require the court of appeals to certify all appeals where a prior decision of this court appears to conflict with United States Supreme Court precedent); *State ex rel. Reynolds v. County Court of Kenosha County,* 11 Wis. 2d 560, 105 N.W.2d 876 (1960) (concluding that the supreme court has superintending power under Article VII, Section 3 to restrain the county court of Kenosha County from interfering with the liberty of the sheriff and the county purchasing agent because of matters arising out of a proceeding in that court); *Brand v. Milwaukee County,* 251 Wis. 531, 30 N.W.2d 238 (1947) (concluding that no appeal lies from an order made by a judge in a special proceeding under Ch. 51; *Brand* did not involve the superintending authority of the court); *Johnson* (concluding that the exercise of the supreme court's superin-

¶ 176. Accordingly, I conclude, as I began, by stating that it would benefit both juveniles and law enforcement if the legislature were to enact the tape

tending power over "inferior courts" was not limited to the use of the specific writs listed in Article VII, Section 3); *In re Kading,* 70 Wis. 2d 508, 235 N.W.2d 409, 238 N.W.2d 63, 239 N.W.2d 297 (1975) (concluding the supreme court has the authority under Article VII, Section 3 to require a judge to file a financial disclosure statement); *In re Phelan,* 225 Wis. 314, 274 N.W. 411 (1937) (concluding that the supreme court would issue a writ of prohibition to restrain further proceedings in the circuit court for Rock County because of a similar action involving the same controversy and the same parties pending in federal court); *McEwen v. Pierce County,* 90 Wis. 2d 256, 279 N.W.2d 469 (1979) (concluding even though a circuit court order was not appealable, the supreme court's superintending authority over all courts permits it to reach the merits of the circuit court's decision); *The Attorney General v. Blossom,* 1 Wis. 277 [*317] (1853) (concluding the supreme court had original jurisdiction to issue the writs listed in Article VII, Section 3, including quo warranto); *The Attorney General v. Chi. & N.W. Ry. Co.,* 35 Wis. 425 (1874) (concluding the supreme court had original jurisdiction to entertain an action by the attorney general to issue an injunction against railroad companies); *State ex rel. Umbreit v. Helms,* 136 Wis. 432, 118 N.W. 158 (1908) (denying the issuance of a supervisory writ to a trial court that dismissed a criminal complaint because there was another adequate remedy); *Seiler v. State,* 112 Wis. 293, 87 N.W. 1072 (1901) (concluding that the superintending power of the supreme court is limited to controlling other state courts in the exercise of their jurisdiction); *In re Integration of the Bar,* 249 Wis. 523, 25 N.W.2d 500 (1946) (concluding the State Bar Association of Wisconsin should not be integrated; Article VII, Section 3 is not mentioned); *In re Promulgation of a Code of Judicial Ethics,* 36 Wis. 2d 252, 153 N.W.2d 873, 155 N.W.2d 565 (1967) (concluding that the supreme court had inherent and implied supervisory powers sufficient to enact a code of judicial ethics).

recording requirements set out in the majority opinion. My sole concern is that in stretching our constitutional powers to achieve a goal I believe to be good for Wisconsin, we set up a mechanism without checks and balances. Over the long term, judicial restraint better serves the people of Wisconsin than the concentration of power the majority opinion employs. As Justice Robert H. Jackson said, "the validity of a [principle] does not depend on whose ox it gores." *Wells v. Simonds Abrasive Co.*, 345 U.S. 514, 525 (1953). Accordingly, I respectfully dissent from that portion of the majority opinion that requires tape recording of the questioning of juveniles and mandates suppression absent the required recording.

¶ 177.   I am authorized to state that Justice JON P. WILCOX joins the discussion of Article VII, Section 3 of the Wisconsin Constitution in this concurrence and dissent.